[S.F. No. 22709. In Bank. July 13, 1970.]

STANDLEY WALTER, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

COUNSEL

A. Brooks Berlin and Edward J. Boessenecker for Petitioner.

F. LaMar Forshee and Herbert M. Rosenthal for Respondent.

OPINION

THE COURT.—This is a proceeding to review a recommendation of the Disciplinary Board of the State Bar of California that petitioner be suspended from the practice of law for a period of two years on conditions of probation, including actual suspension for the first six months.

*Facts:* Petitioner was admitted to practice in this state in December 1944. For the next 24 years, he taught law at Lincoln University Law School and also engaged in the practice of law, maintaining a law office in San Francisco.

Wallace O. Jones was one of petitioner's clients from 1953 until he died in 1957. Before Mr. Jones' death, he had inherited an interest in several Canadian estates, which held certain real property in Toronto, Canada. Upon his death, he left his interest in such estates to his wife, Lois C. Jones. Mrs. Jones died in May 1962, leaving a will in which her brother, William Swafford, who lived in Colorado, was named executor. Mr. Swafford retained petitioner to represent him in the probate of Mrs. Jones' estate. Mrs. Jones' heirs were two minors, who were nonresidents of

California. A $3,000 inheritance tax was imposed in Canada; it was paid from the net rents which accumulated after Mrs. Jones' death.

Petitioner attempted to sell the decedent's interest in the estates, and in July 1965 a sale was finally effected through a Canadian law firm for $21,000 in Canadian money ($19,437.96 in United States currency). In August 1966, Mr. Swafford, as executor, received therefor two Canadian checks, made payable to the Estate of Lois C. Jones, one for $7,000 in Canadian money and the other for $14,000 in Canadian money. He endorsed both checks to petitioner and sent them to him, requesting that a preliminary distribution to the heirs be made.

Petitioner received both checks in August 1966, but he did not arrange for a distribution to the heirs or otherwise use the proceeds for the purposes of the estate. After the checks were sent to petitioner, the executor and the heirs apparently made frequent demands on him for distribution. Finally, in March 1968 (over a year and a half later and after petitioner had become the subject of disciplinary investigation in this matter) petitioner resigned as attorney for the executor and made restitution to the executor's new attorney.

### Petitioner's Misappropriation of the Proceeds of the $7,000 Canadian Check

August 26, 1966, petitioner presented the $7,000 check to the Haight-Clayton Branch of the Bank of America, in San Francisco, for collection. He requested, and received, from the bank a $250 cash advance against the collection, as well as a $750 advance, which latter advance was deposited in the trust account he maintained at the bank.

Mr. Edward Hallett, the assistant manager of the Haight-Clayton Branch of the Bank of America, testified that petitioner, the day he turned the check over to the bank for collection, gave instructions to apply $1,000 of the proceeds to his personal loans with the bank. Mr. Hallett said that he thereupon made a notation upon the "collection receipt" reading, "He [petitioner] wants to pay $1,000 on loans." The "collection receipt" further bears a notation, "See Dito- . . . Apply Part To Loans." Petitioner's signature appears on the receipt, which is dated August 26, 1966.

In his testimony, petitioner admitted saying that he "wanted to pay $1,000 on his loans," but he denied that he intended the statement as an authorization or instruction to debit the collection. Petitioner nevertheless permitted the bank to apply $991 of the collection proceeds to his personal loans. He admitted that the signature on the "collection receipt" was his, that he had read the receipt before signing it, and that it was "completely

filled out" when he signed it. Petitioner also indicated in his testimony that he had received frequent notices from the bank in the summer of 1966 to the effect that he was delinquent in his payments on his loans, and he stated that at such time he may have authorized the bank to apply funds held in his trust accounut to his personal loans.

August 29, 1966, three days after the $750 advance was deposited in petitioner's trust account, he withdrew the entire sum. The following day, he requested a $500 advance on the collection and received it. That advance was deposited in petitioner's trust account the same day, but by September 8, 1966, he had withdrawn the entire sum.

September 8, 1966, the Haight-Clayton Branch of the Bank of America effected a collection of $6,475 in United States currency on the $7,000 Canadian check. From the $6,475, the bank deducted the advances previously made to petitioner (totaling $1,500), leaving a balance in the collection proceeds of $4,975. September 12 and 13, 1966, the bank deducted from the remaining proceeds a total of $991, which it applied to petitioner's personal loans, as instructed by him.[1]

September 13, 1966, petitioner received the balance of the collection proceeds, amounting to $3,984, which he deposited in his trust account. With this deposit, the trust account had $4,423.78 in it. By October 11, 1966, the balance had been reduced to $928.68. On that date, therefore, of the $6,475 belonging to the Jones estate only $488.90 could be traced to petitioner's trust account. Although the record is not clear as to what happened to the $488.90 then in the trust account, it is clear that petitioner did not use it for purposes of the Jones estate. According to his testimony, he used the proceeds in his trust account for "other estates" he was handling.

*Petitioner's Misappropriation of the Proceeds of the $14,000 Canadian Check*

September 12, 1966, petitioner presented the $14,000 Canadian check to the 21st and Irving Branch of the Bank of America, San Francisco, for collection. September 21, 1966, that branch of the Bank of America effected a collection of $12,962.96 in United States currency on the check. The same day, petitioner requested, and received, from the bank a cashier's check for the proceeds of the collection, payable to his order. He held the cashier's check for approximately a week, and then cashed it September

---

[1]September 12, 1966, the bank credited $305.51 from the collection proceeds to petitioner's time-plan loan with it. The following day, the bank credited $500 from the collection proceeds to the principal of petitioner's unsecured commercial loan with it. Also, the bank credited from the collection the amounts of $71.21, $56.19, and $58.09 to interest due and owing on petitioner's loans.

29, 1966, taking $4,000 in cash and another cashier's check for $8,962.96, also payable to his order, for the balance.

Petitioner testified with respect to the transaction, as follows: "Q. Now, what was the purpose of that transaction? A. To get the money. Q. Well, why didn't you take it either all in cash or all in check? . . . A. . . . . It didn't seem to me to be a good idea at the time. I was simply holding cash, and I thought it would be easier to hold it, the four, in cash. Q. And what did you do with the $4,000 in cash? A. I kept it in my office. Q. Where? A. . . . . I simply kept that in my office desk drawer. Q. . . . . [D]id you keep records with respect to the money that you kept in your office desk drawer? A. No." (Italics added.)

Petitioner further testified that he deposited the cashier's check for $8,962.96 in his trust account at the Haight-Clayton Branch of the Bank of America for the purpose of using it in connection with other estates he was handling. The deposit was apparently made October 12, 1966.

*Petitioner's Explanation*

According to petitioner's uncorroborated testimony, he set aside $20,000 of his own money on or before August 26, 1966 (which was when he received the Canadian checks but several weeks before he received the proceeds therefrom), put it in an envelope, and attached the envelope with a paper clip to the file folder of the Lois C. Jones estate, which file he kept in his offic. He further contends, in substance, that February 27, 1968 (a year and a half later), after being instructed to do so by the State Bar investigating committee in the present matter, he deposited $19,437.96 from this sum in a trust account and that in March 1968, after he had made restitution to the Jones estate from the trust account, he first became aware of the mandate of rule 9 of the Rules of Professional Conduct.[2]

When asked, with respect to the $8,962.96 check deposited to his trust account in October 1966, why he did not deposit it in his personal account instead if he was holding $20,000 in cash in his office for the estate, petitioner said that he was closing out his personal account; but he admitted that it was still open in December 1966.

---

[2]Rule 9 of the Rules of Professional Conduct reads: "A member of the State Bar shall not commingle the money or other property of a client with his own; and he shall promptly report to the client the receipt by him of all money and other property belonging to such client. Unless the client otherwise directs in writing, he shall promptly deposit his client's funds in a bank or trust company, authorized to do business in the State of California, in a bank account separate from his own account and clearly designated as 'Clients' Funds Account' or 'Trust Funds Account,' or words of similar import. . . ."

*Questions:* First. *Does the evidence sustain the finding of culpability on the part of petitioner?*

*Yes.* ▇ The burden is upon one seeking a review of a recommendation of the disciplinary board to show that its findings are not supported by the evidence or that its recommendation is erroneous or unlawful. (*Eschwig* v. *State Bar,* 1 Cal.3d 8, 15 [81 Cal.Rptr. 352, 459 P.2d 904].) In the present matter, however, it is clear that petitioner has not met this burden.

Petitioner contends that he was not aware of the mandate of rule 9 until March 1968, at which time he says he received public reproval in a prior proceeding for an earlier violation of rule 9. However, the notice to show cause in the prior proceeding was served on petitioner April 20, 1967, and notified him, among other things, that he was being charged with a violation of rule 9. Hearings were held in July and September 1967, at which time it is apparent that rule 9 and the necessity of keeping separate accounts must have been called to petitioner's attention.

According to the State Bar's records, the disciplinary board, after hearing testimony from petitioner at its meeting on February 9, 1968, adopted a motion that he be publicly reproved for violating rule 9 in connection with his handling of another estate matter. The board found in such prior disciplinary matter that petitioner had been employed as an attorney by a Mrs. Rawnsley in January 1963 to settle the estate of her deceased mother; that on January 9, 1963, petitioner's client delivered to him a check, payable to his order, in the amount of $1,000, to cover his estimate of an advance payment of California inheritance tax; that shortly after receipt of the check, petitioner deposited it in his trust account at the Haight-Clayton Branch of the Bank of America; that after the deposit was made, and between January 11, 1963, and February 5, 1963, petitioner withdrew the entire proceeds for purposes other than those of Mrs. Rawnsley; and that on October 19, 1966 (more than three years later), petitioner purchased a cashier's check for $1,000 and delivered it to his client as repayment of the money he had received.

▇ In the previous disciplinary proceeding, petitioner testified that when he received the $1,000 from his client, he placed a like amount of cash in an envelope and pinned it to his client's file, which he kept locked in his office. His explanation was accepted. There was no finding that he had misappropriated the money, and petitioner was merely reproved for his violation of rule 9. In the light of the present matter, however, it can be inferred that petitioner's previous misconduct involved an intentional misappropriation and, further, that the $1,000 petitioner repaid Mrs.

Rawnsley in October 1966 came from monies belonging to the Jones estate and received by petitioner shortly prior thereto.

Under all the circumstances, the disciplinary board properly rejected the same uncorroborated excuse urged by petitioner in the present matter and found that he had not only violated rule 9 but had also intentionally misappropriated the funds involved.

Petitioner emphasizes that the accountant who kept his books until the accountant's death in 1966 had advised him it was not necessary to maintain estate funds in a trustee account; and he says that he relied on that advice. It is difficult to believe, however, that petitioner would determine his responsibilities as an attorney based on the advice of an accountant. An attorney's duty to hold money received in trust inviolate and separate from his own was well established long prior to petitioner's admission to the bar; and petitioner admittedly was no neophyte in the practice of the law at the times herein involved. ■ The fact that at least as far back as 1966 he was maintaining a trust account and admitted that it had been set up for estate trust funds is consistent with an inference that he was fully aware of the mandate of rule 9. Furthermore, petitioner's testimony quoted in the footnote below shows that he chose to ignore the mandate of rule 9.[3]

■ Another reason given by petitioner for his failure to keep all the estate funds in his trust account was that in 1965 he had decided to discontinue his law practice due to poor health, and he was deliberately depleting the funds in his trust account in the summer of 1966. Not only would such a reason not excuse petitioner's violation of rule 9 when trust funds were still in his possession, but it appears that there is no support in the record for the alleged reason. At the time of the local administrative committee hearing herein on November 6, 1968, petitioner admitted that he had not concluded his practice, and the record shows that the trust

[3]Petitioner testified, as follows: "Q. . . . [I]f you had $20,000 in cash in this file at this very time, August 26, 1966, why is it that you needed $250 advance in cash and $750 credited to your trust account as an advance? A. It was not an advance to me, it was not advanced to me personally. It was an advance to my trust account. Q. Well, you said you were going to use the $750 for trust purposes. This trust, this account . . . . What I want to know is: Why did you have to get an advance of $750 when you had $20,000 in cash in this file in your office? . . . . A. . . . I had drawn practically all of my assets out of my trust account. When this money came in from Canada, it became necessary to revive my trust account in the bank. I put sufficient money in the envelope to cover the money I received. Then I wanted to create some money in the trust account to cover other trust expenses that were coming up, to pay different trust items I had to pay . . . . Q. Why didn't you just do the opposite [i.e., why didn't you put the $20,000 in the trust account]? A. *It wasn't handy. In other words, I had the $20,000 put away. It wasn't handy to run down and get it all the time. It seemed like an enormous amount of work.* . . ." (Italics added.)

account petitioner maintained with the Haight-Clayton Branch of the Bank of America was active at the times here in question.

It is also significant that petitioner did not produce any records of account in regard to the Jones estate or any written records to show what was supposedly applied to other estates. ▇ An attorney's failure to keep proper books of account is in itself a suspicious circumstance. (*Clark v. State Bar,* 39 Cal.2d 161, 174 [246 P.2d 1].) With other circumstances in this matter, petitioner's failure to keep records supports an inference that he converted the proceeds of both checks for his own use.

Petitioner seeks to excuse his failure to make prompt restitution to Mrs. Jones' estate or arrange for distribution to the heirs, as he had been directed by his client, on the ground that there was a dispute between himself and an official of the California State Controller's office over the inheritance tax due on the estate.

An associate inheritance tax attorney from the State Controller's office testified that if an estate consisted of real property in Canada, no California inheritance tax would be due. The inventory and appraisement in Mrs. Jones' estate lists as the chief asset an interest in certain Canadian estates and describes it as personal property valued at a little over $22,000. As hereinabove indicated, the principal assets of the Canadian estates consisted of real property; and petitioner says that he held up effecting distribution of Mrs. Jones' estate, endeavoring to establish through the Canadian solicitors that the decedent's interest in the Canadian estates should be treated as real property.

As early as May 6, 1965, petitioner contacted the inheritance tax appraiser, asking that the matter be held in abeyance, as he wanted to show that no inheritance tax was due. Petitioner again called the appraiser August 25, 1965, asking that the matter be held in abeyance. As indicated above, petitioner received in September 1966 the proceeds of the checks covering the sale of the decedent's interest in the Canadian estates, and he still had not arranged for distribution by March 1968. This means that for a period of almost a year and a half before he received the proceeds of the checks petitioner was aware of the problem; yet, during a period of almost three years he did not obtain resolution of an issue which apparently depended on the making of a comparatively simple showing.

▇ In addition, the maximum inheritance tax on an estate of the value of Mrs. Jones' estate, where the property is to pass to a niece and a nephew of the decedent (as was the case here), according to the testimony of the associate inheritance tax attorney, is, roughly, $1,000. Under the circumstances, the existence of a dispute with respect to the estate's lia-

bility for inheritance tax can hardly be considered an excuse for petitioner's failure to effect at least a partial distribution, particularly where he was being importuned by both the executor and the heirs to have the funds distributed.

■ Petitioner contends that he was denied due process of law, because he had no opportunity to examine the documentary exhibits before appearing at the disciplinary board hearing. There is no merit to this contention. The record discloses that petitioner did not request a continuance of the proceedings in order to examine the exhibits, nor did he raise before the disciplinary board the point that he had not been allowed to examine them.[4]

Petitioner further contends that he was deprived of due process of law, because he did not have an opportunity to cross-examine the executor, whom he identifies as the complaining witness in this matter. This contention is likewise without merit. ■ Although petitioner describes the executor as a complaining witness, he was not, in fact, a witness at any time in this disciplinary proceeding. Accordingly, petitioner had no right to cross-examine him, and section 6085, subdivision (c), of the Business and Professions Code, cited by petitioner, relating to the cross-examination of witnesses in State Bar formal proceedings, is inapplicable.

This proceeding, moreover, like all other original disciplinary proceedings, was commenced by a notice to show cause issued by a local administrative committee after its own preliminary investigation. ■ The statement of this court in *McGrath* v. *State Bar,* 21 Cal.2d 737, 740 [2] [135 P.2d 1], is apropos here: "Petitioner contends . . . that the local administrative committee's findings and recommendation and the Board of Governors' recommendation are without support because the complaining witnesses did not appear or testify at the hearings before the committee. The appearance and testimony of a complaining witness is [*sic*] not essential in proceedings of this nature, however, for the local commttee or Board of Governors may of its own motion, and without the filing or presentation of any complaint, institute and conduct disciplinary proceedings against members of the Bar. [Citations.]" (See also *Tapley* v. *State Bar,* 8 Cal.2d 167, 172-173 [4] [64 P.2d 404].)

■ In addition, rule 19 of the Rules of Procedure of the State Bar of California (Bus. & Prof. Code, foll. § 6087) provides, in part: "A complaining witness shall assist in the conduct of the preliminary investigation

---

[4]Rule 3.5 and 35 of the Rules of Procedure of the State Bar, cited by petitioner in support of his claim that he was entitled to copies of the exhibits, are not in point. Rule 3.5 relates to the return of exhibits to persons who provided them when their retention is no longer necessary. Rule 35 relates to making a copy of a transcript available and does not relate to exhibits.

and shall, upon request, in a preliminary investigation or formal proceeding, furnish the committee or examiner with all documents and other evidence in his possession and the names and addresses of witnesses, and shall otherwise assist the committee or examiner in securing evidence in support of the charges made. However, neither unwillingness nor neglect of the complaining witness so to do, nor settlement, compromise nor restitution, excuses a committee from failing to undertake or complete a preliminary investigation or a formal proceeding." Accordingly, it is clear there is no requirement that a complaning witness appear at a disciplinary hearing.

█ Second. *Is the recommended discipline (suspension from the practice of law for a period of two years on conditions of probation, including actual suspension for the first six months) warranted under the facts of this matter?*

*Yes.* █ As stated by this court in *Most* v. *State Bar,* 67 Cal.2d 589, 599 [63 Cal.Rptr. 265, 432 P.2d 953]: " 'Misappropriation of funds entrusted to an attorney at law is a gross violation of general morality as well as professional ethics and, in addition, is likely to endanger the confidence of the public in the legal profession. It deserves severe punishment.' " █ In the present matter, petitioner's conduct clearly justifies the discipline recommended by the disciplinary board.

It is ordered that petitioner be suspended from the practice of law for a period of two years, and that execution of the order be stayed and petitioner be placed on probation for said period of two years upon the conditions prescribed by the board in this matter, including actual suspension from practice for the first six months thereof, the order to be effective 30 days after the filing of this opinion.

Petitioner's application for a rehearing was denied August 12, 1970.