[S.F. No. 22868. In Bank. Sept. 22, 1972.]

PAUL SUREN MOSESIAN, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

L. Kenneth Say for Petitioner.

F. LaMar Forshee, Herbert M. Rosenthal and Ronald W. Stovitz for Respondent.

**OPINION**

**THE COURT.**—This is a proceeding to review a recommendation of the Disciplinary Board of the State Bar of California that petitioner be suspended from the practice of law for a period of one month.

*Facts*: Petitioner, who was admitted to practice in 1964 and is now 33 years old, has lived in Fresno all his life. His grandmother died in 1955, leaving a considerable estate. Substantial family problems existed, and a feeling of great bitterness developed between petitioner's father, Suren P. Mosesian (hereinafter referred to as "Suren") and petitioner's aunt, Bernice Mosesian (hereinafter referred to as "Bernice").

At some time prior to October 1964, on a complaint by Bernice, Suren was charged in a criminal proceeding with disturbing the peace. He successfully defended the charge, and in October 1964 he sued Bernice in the Superior Court of Fresno County for malicious prosecution. In April 1965, Bernice filed a cross-complaint for damages for slander, based on an epithet allegedly uttered by Suren and impugning Bernice's sexual morality. After 10 days of trial in March 1967, the matter was continued for hearing on the issue of damages. Such a hearing was held December 21 and 22, 1967. On the last day, petitioner, who was co-counsel for his father (James Janjigian, with whom petitioner was then associated in the practice of law, was principal counsel for Suren in the trial), testified with respect to the reputation of Bernice in the community within the past four or five years in matters of sexual morality, naming between 30 and 40 persons from whom he had allegedly derived knowledge of Bernice's said reputation. The evidence was presented on the issue of mitigation of damages on Bernice's cross-complaint for slander. At the conclusion of the hearing, the trial court awarded Bernice judgment on Suren's complaint for malicious prosecution, and found for Bernice on her cross-complaint and awarded her $5,000 in damages.

It is with respect to petitioner's testimony in the aforesaid civil action that these proceedings were instituted. They were instituted on the complaint of Bernice and charged petitioner with having made certain statements under oath knowing them to be false when made and having made them in an attempt to mislead the trial judge.

The local administrative committee found petitioner culpable and recommended that he be suspended for 90 days. A subsequent hearing was held before that committee upon the presentation of further evidence, with the same result. Thereafter, the disciplinary board independently reviewed the evidence and found, among other things, as follows: (a) That petitioner knowingly testified falsely by stating that he derived knowledge of Bernice's reputation from certain named persons; (b) that petitioner knowingly testified falsely when he stated that all persons named by him had expressed opinions as to Bernice's general reputation and further testified falsely when he stated that nine out of ten of the persons he named expressed the opinion that Bernice's reputation for sexual morality was bad; and (c) that petitioner knowingly testified falsely when he stated that almost all persons named by him had heard of relationships had by Bernice with a certain man (who was named in the findings). The disciplinary board, however, by a 13 to 1 vote, recommended that petitioner be suspended for one month, instead of the 90-day period recommended by the local administrative committee.

*Questions:* ▆ First. *Does the evidence sustain the finding of culpability on the part of the petitioner?*

*Yes.* ▆ The burden is upon one seeking a review of a recommendation of the disciplinary board to show that its findings are not supported by the evidence or that its recommendation is erroneous or unlawful. (*Walter* v. *State Bar,* 2 Cal.3d 880, 887 (2) [87 Cal.Rptr. 833, 471 P.2d 481].) In the present matter, however, it is clear that petitioner has not met this burden.

▆ Petitioner's credibility as a witness was in issue, as a result of which this court will give great weight to the findings of the local administrative committee. (*Ridley* v. *State Bar,* 6 Cal.3d 551, 559 (1) [99 Cal.Rptr. 873, 493 P.2d 105]; *Himmel* v. *State Bar,* 4 Cal.3d 786, 794 (4) [94 Cal.Rptr. 825, 484 P.2d 993].) That committee, which saw and heard petitioner, found him culpable; and the evidence overwhelmingly supports the findings that petitioner knowingly testified falsely in the civil action.

▆ It should be noted, to begin with, that the essential issue in this proceeding is not the truth or falsity of petitioner's opinion of Bernice's reputation. Rather, it is whether petitioner knowingly testified falsely when he named certain persons as those from whom he derived knowledge of Bernice's reputation.

When petitioner was called to the witness stand by Mr. Janjigian, he was asked on direct examination if he knew Bernice's general reputation in the community within the last four or five years in matters of sexual morality. In response, petitioner testified that he knew her reputation and that it was that she involved herself illicitly with men in sexual activities.

On cross-examination, Bernice's counsel asked petitioner from whom he had derived his knowledge of Bernice's general reputation as to matters of sexual morality, and petitioner testified: "Well, let's see. I'll start with the professional people. I have talked to at least one doctor. I have talked to several attorneys. I can give you names, if you want." Petitioner seemed reluctant to reveal the name of the doctor he had referred to, but the trial court required him to do so. He then testified that he thought it was Dr. Simmang and that his conversation with the doctor had been by telephone. When asked for further details, however, petitioner's response was equivocal.[1]

---

[1]Petitioner testified: "Q. In the course of your conversation with Doctor Simmang, was the matter of [Bernice's] general reputation for sexual morality even discussed? A. Just a moment, just in the way I related. I am not going to try to interpret whether

In May 1968, Dr. Simmang signed a witnessed statement declaring that he had never discussed Bernice's personal history with petitioner and that he had no knowledge of her general reputation in matters of sexual morality. He testified to the same effect at the hearing before the local administrative committee in this proceeding.

Petitioner further testified in the civil action, with regard to how he had acquired his knowledge of Bernice's general reputation for sexual morality, that he had talked with several attorneys. Later, he named six attorneys, including William Meux and Howard Thomas. Mr. Meux sent a letter to Bernice in May 1968, stating that he had no recollection of ever having discussed the slander case with petitioner and that he had never discussed her personal affairs since her divorce action. At the hearing before the local administrative committee, Mr. Meux testified that he had never discussed with petitioner Bernice's reputation for sexual morality and that although petitioner may have mentioned the possibility of calling him as a witness in the civil action, there was never at any time any discussion between him and petitioner about Bernice's sexual activities.

Mr. Thomas testified at the hearing before the local administrative committee that he had never had any discussion with petitioner relative to the sexual morality of Bernice and that he recalled an occasion when petitioner and his father came to his office but that, regardless of what anyone else may have said at that time, he himself never discussed Bernice's sexual morality.

Another person named by petitioner as one from whom he had obtained knowledge of Bernice's said reputation was Ida Poggett, who worked for Bernice until about 10 years before the hearing in the civil action. Three days before petitioner gave his testimony in the civil action, however, she made a written statement in petitioner's office, witnessed by him, in which she stated that she had no knowledge of Bernice's sex life or of her character for chastity and morality during the past five or six years and did not know if her reputation in such respects was good or bad, as she had never heard any discussion about her in regard to these traits. Petitioner had apparently planned to have her testify as a witness in his father's behalf, but, in view of her response to his questioning, decided not to put her on the stand. At the hearing before the local administrative committee, she testified that the only time she ever discussed Bernice's reputation with petitioner was during the interview at his office and that she told him she knew nothing about Bernice's sexual morality.

Another person whom petitioner had hoped to use as a witness in the

it was general reputation or not. It is what he heard and it was a question addressed to me and I responded."

civil action to testify with respect to Bernice's reputation was Erwin Kasey. According to Mr. Kasey's testimony before the local administrative committee, however, he told petitioner that he had not seen Bernice for 10 years and knew nothing about her morals or character during that time; and he was not called to testify in the civil action. Petitioner nevertheless named Mr. Kasey as one of the persons from whom he derived knowledge of Bernice's reputation.

In addition to the five persons just hereinabove mentioned, seven other persons of those named by petitioner in the civil action testified at the hearing before the local administrative committee, denying that they had ever discussed with petitioner Bernice's general reputation. Several others made written statements denying having discussed the matter with petitioner. It is not considered necessary that all of such evidence be set forth here. Suffice it to say that of the persons named by petitioner, 15 refuted the substance of his testimony; and their denials were emphatic, constituting strong support for the findings that petitioner knowingly gave false testimony in the civil action.

Petitioner points out that he was under great stress during the trial of the civil action, as it was a case charged with emotion, and, in addition, he had injured his back in a fall a few days earlier. Significantly, however, petitioner gave part of his testimony at the court's morning session and then, after a two-hour recess, during which he had had ample time to reflect on what he was doing, continued naming other persons. After he had named them all, the following took place: "THE COURT: He is testifying to individual discussions. *Let's ask him first, did all of these people express opinions as to her general reputation.* THE WITNESS [Petitioner]: Quite clearly. THE COURT: *Everyone of them?* THE WITNESS: *Yes.* THE COURT: And they said it was bad? THE WITNESS: Well, let me just think a minute. I say that that is her general reputation. I am not going to—THE COURT: No, no, now we are referring to what these people told you, that is the question, sir. *Did all of these people in these conversations express an opinion that the reputation of [Bernice] was bad for sexual morality?* THE WITNESS: *At least nine out of ten,* Your Honor." (Italics added.)

At the hearing before the disciplinary board, petitioner introduced for the first time a letter from the judge who presided at the trial of the civil action, in which the judge (by that time retired) stated, in part, as follows: "I am writing this letter from the Kings County Courthouse, to which I have been assigned by the Judicial Council, and have had no opportunity to review the file in the Fresno County Courthouse. However, I have no recollection whatever of having either stated or believed that [petitioner] endeavored to mislead the Court in certain testimony which he gave in

that action. I am told that the particular testimony referred to is that in which he is alleged to have stated, or have testified that his Aunt, Bernice Mosesian, was of unchaste character and had a reputation for promiscuity. I believe he testified somewhat to that effect, but I was then, and am now, of the opinion that this was his honest belief and not that it was intended to mislead the Court or that it did, in fact, mislead the Court.

"In fairness to [petitioner], I am making this statement of my views and beliefs."

Once petitioner took the witness stand and was sworn, it was incumbent upon him as a witness, but in particular as a member of the State Bar, to testify in complete candor and never to seek to mislead. Even if he had not been sworn, he would still be held to the same high standards of honesty and candor in his statements to the court. (See Bus. & Prof. Code, § 6068, subds. (b) and (d); see, e.g., *Lee* v. *State Bar,* 2 Cal.3d 927, 941 [88 Cal. Rptr. 361, 472 P.2d 449]; *Reznik* v. *State Bar,* 1 Cal.3d 198, 203-204 (4) [81 Cal.Rptr. 769, 460 P.2d 969, 40 A.L.R.3d 161].) Whether petitioner succeeded in misleading the court, or whether any harm was done, is immaterial. (*Reznik* v. *State Bar, supra,* 1 Cal.3d 198, 203-204 (4, 6); *Scofield* v. *State Bar,* 62 Cal.2d 624, 628 [3] [43 Cal.Rptr. 825, 401 P.2d 217]; *McKinney* v. *State Bar,* 62 Cal.2d 194, 196 [3] [41 Cal.Rptr. 665, 397 P.2d 425].)

Second. *What discipline should be imposed upon petitioner?*

■ Petitioner's conduct was reprehensible, and he should be disciplined therefor. Under the circumstances here involved, however, a reprimand is sufficient, and the publication of this opinion will constitute the reprimand.