[L.A. No. 30096. In Bank. May 4, 1973.]

CHARLES L. FIELDING, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

James F. Doak for Petitioner.

F. LaMar Forshee, Herbert M. Rosenthal and Ronald W. Stovitz for Respondent.

**OPINION**

**THE COURT.**—This is a proceeding to review a recommendation of the Disciplinary Board that petitioner be suspended from the practice of law for three months.[1]

Petitioner who was admitted to practice in 1953, was charged in a notice to show cause with converting $1,253.30, which he held in trust and had a duty to apply in payment of medical expenses of his clients, Mr. and Mrs. Scott Gayhardt. Petitioner denied the charges.

*The Evidence*

About March 16, 1963, petitioner was retained by Mr. and Mrs. Gayhardt to represent them and their child in connection with personal injuries

---

[1] Nine board members so recommended; three voted against the recommendation on the ground such discipline is insufficient. The local committee (3 members) unanimously recommended six months' suspension.

they sustained. A few days later Kaiser Foundation Hospital addressed a letter to him signed by his clients directing him to pay to Kaiser its charges to them from any recovery. Petitioner testified he did not recall receiving the letter but admitted having a copy of it in his file.

Petitioner brought an action on his clients' behalf and on February 21, 1967, obtained a $5,750 draft in settlement of the action.

That same day a bank advanced petitioner credit (apparently against the draft) for $5,750 and he paid the Gayhardts their share of the net proceeds, retained his attorney's fees and costs, and with the balance secured a $1,253.30 cashier's check payable to himself as trustee.

Petitioner was then aware his clients owed Kaiser $1,253.30. According to Mrs. Gayhardt, when petitioner disbursed the funds he stated his secretary would mail a check to Kaiser. On March 3, 1967, petitioner wrote the Gayhardts letters, which indicate that he understood the $1,253.30 was to be paid by him to Kaiser.[2] A declaration by Mr. Gayhardt shows he likewise so understood.

Petitioner admitted sending the March 3 letters but testified there "was a subsequent revocation . . . both orally and confirmed in writing by me as to part of those letters that relates to Kaiser . . . ." According to petitioner, he explained to the Gayhardts that there had been described changes in Kaiser's policy regarding reimbursement in accident cases, and during conversations with Mrs. Gayhardt he said he would discuss with Kaiser whether its charges could be reduced. Petitioner stated that the conversations were confirmed in a letter he wrote Mrs. Gayhardt but that he could not find his copy of the letter.[3] Mrs. Gayhardt, however, testified that it was before the settlement that petitioner told her that it was sometimes possible to negotiate with Kaiser regarding a reduction in charges and

---

[2]The letter to Mrs. Gayhardt stated: ". . . The disbursements [from the settlement draft] were as follows: . . . Your payment of your medical expenses in the amount of $1,140.30 reflecting your personal medical expenses to Kaiser Hospital, and the further sum of $45.50 reflecting the payment of the medical expenses for your child to Kaiser Hospital which were payable by Cashier's Check numbered 8703, payable to the undersigned as trustee *with the indication that I will pay over the same to Kaiser Hospital.*" (Italics added.)

The letter to Mr. Gayhardt read: ". . . You will recall that we disbursed by cashier's check the following sums . . .: . . . Cashier's check No. 8703, payable to myself as trustee, I was handed by you the sum of $67.50 *for transmittal to Kaiser Hospital to cover your medical expenses. You will recall that one cashier's check in the amount of $1,253.30 reflected the total medical expenses due by your family to Kaiser Hospital.*" (Italics added.)

[3]Petitioner testified that he had a flood in his office and that many records were mislaid as a result of that.

that after receiving a letter from petitioner (apparently the March 3 letter) she felt that Kaiser was paid.

On March 7, 1967, petitioner negotiated the $1,253.30 check, deposited $153.30 of that sum in his trust account, and took the remaining $1,100 in cash. That same month he loaned the $1,100 to a speculative business called Hydro Life Sales Company, in which he served as counsel and secretary. Hydro Life engaged in selling a device, which petitioner called "the Poor Man's Jacuzzi." About mid-1967 Hydro Life went out of business.

The evidence is conflicting as to whether Mrs. Gayhardt orally authorized petitioner to make the loan. She testified that she never gave petitioner authority to loan the money to anyone and that she never heard of Hydro Life. She stated that in 1969 or 1970 (i.e., at least 21 months after the loan was made) petitioner mentioned to her "something . . . about contributing money to some fund . . . some corporation or something that had ministers connected with it,[4] but it was nothing by the name of Hydro Life" and that the conversation did not pertain to her loaning the money that was to be held for the medical bills. A declaration by Mr. Gayhardt states that he was never informed of any loan of the funds retained by petitioner.

Mrs. Gayhardt further testified that she thought Kaiser had been paid until she received demands for payment from Kaiser. The Gayhardts talked to petitioner several times about the matter, and on one occasion petitioner said that the money was tied up but he would pay Kaiser. According to a declaration by Mr. Gayhardt, on numerous occasions he tried to call petitioner and "was almost never able to speak with him as soon as the secretary found out who was calling."[5]

Petitioner testified that Mrs. Gayhardt orally authorized him to make the loan to Hydro Life. He admitted he lacked written authority from her and stated that he did not feel he needed her signature since the Gayhardts had been his clients since 1956. At the local committee hearing he testified to various details regarding the loan and stated, inter alia, that he did not remember whether any note was executed between Hydro Life and Mrs. Gayhardt.[6] Before the board, however, he testified that after the local

---

[4] A minister was the president of Hydro Life at one time.

[5] Mrs. Gayhardt testified that one time when her husband called petitioner's office the secretary stated that petitioner was out of town and that five minutes later her husband called back and gave a different name and petitioner was in the office.

[6] He further testified: The loan was made at an interest rate of 10 percent per annum. He told Mrs. Gayhardt he "would guarantee that she would sustain no loss." He did not think a written guarantee was necessary. Interest was never paid to her

committee hearing he discovered a note in his files. The note recites "Received of Mrs. . . . Gayhardt . . . One Thousand One Hundred Dollars. I promise to repay said sum plus ten percent interest on or before April 20, 1967. Fulton G. Louis." Petitioner stated that Louis was a representative of Hydro Life. Petitioner admitted that the note was never delivered to Mrs. Gayhardt.

Petitioner's testimony that Louis executed the note is not in accord with Louis' testimony before the local committee, and Louis was not recalled to testify before the board. At the local committee hearing Louis, who was called as a witness by petitioner, testified: He was vice-president of Hydro Life at one time. Petitioner gave him several cashier's checks representing loans to Hydro Life and informed Louis that petitioner had borrowed the money from clients. One such check was for $1,100. Petitioner did not give Louis the lender's name. Louis was not familiar with the name "Gayhardt" and never executed any notes on behalf of the corporation to petitioner for the money he advanced by way of cashier's checks.

In September 1970 the State Bar notified petitioner that a complaint had been filed against him by the attorney for Kaiser, James Baldwin. The following month petitioner sent Baldwin a $1,253.36 cashier's check, but it was refused. Payment of that sum was made to Baldwin in February 1971.

### The Findings

The board found in brief: *Petitioner was directed in writing by the Gayhardts to pay Kaiser its charges to them from any recovery.* Petitioner received $5,750 in settlement of the Gayhardts' action and retained $1,253.30 of that amount *for the purpose and with the understanding of his clients that it would be used to pay Kaiser. He subsequently converted $1,100 of that sum by delivering it to a corporation without his clients' knowledge or consent.* It was not until over three and a half years later and after a complaint had been made to the State Bar that he paid Kaiser by tendering to its attorney a check for $1,253.36.

The local committee likewise found that petitioner made the loan without the knowledge or consent of the Gayhardts.

### Whether the Evidence Supports the Findings

Petitioner contends that the italicized findings are not supported by the evidence. ■ With respect to the first such finding, he asserts that there

---

because Hydro Life had no money. She never received any funds from Hydro Life or him between March 1967 and September 1970. He thought that when Hydro Life went out of business he advised her that Hydro Life would be unable to repay her loan, but he did not believe he wrote her any letter to that effect.

is no evidence he received the letter signed by the Gayhardts directing him to pay Kaiser its charges to them from any recovery. However, he admitted having a copy of the letter in his file, and this admission and the letter support the finding. Moreover, even if he had not received the letter, it is apparent from his March 3, 1967, letters to the Gayhardts that he was then aware that he held the $1,253.30 in trust for payment of the Gayhardts' medical expenses at Kaiser.

We are satisfied that the heretofore recited evidence also supports the other italicized findings. Although petitioner claimed that Mrs. Gayhardt orally authorized him to loan the money to Hydro Life, she denied having done so. The fact that the money was loaned to a corporation with which petitioner was closely connected and his failure to provide her with written documentation of the loan are suspicious circumstances.[7] The local committee was in a better position than this court to resolve the conflict in the testimony. (*Mrakich* v. *State Bar,* 8 Cal.3d 896, 905 [106 Cal.Rptr. 497, 506 P.2d 633]; *Himmel* v. *State Bar,* 4 Cal.3d 786, 797 [94 Cal.Rptr. 825, 484 P.2d 993].) Petitioner admittedly did not have written authority in this regard.

### Discipline

Petitioner asserts that three months' suspension is too severe—that "[f]or the small independent practitioner, this is virtual ruin of his practice." This assertion manifestly does not meet his burden of showing that the board's recommendation is erroneous.

The misconduct was serious and a repetition of prior similar misconduct that resulted in petitioner being publicly reproved in November 1970. From the findings in that proceeding it appears that in 1965 he made an unauthorized use of $3,500 of funds he held in trust for clients and that at the time of the board hearing in that proceeding he had not made restitution.

In the instant matter petitioner has made restitution, but restitution was not made until after the State Bar wrote him that a complaint had been filed against him by Kaiser's attorney.

In *Bernstein* v. *State Bar,* 6 Cal.3d 909 [101 Cal.Rptr. 369, 495 P.2d 1289], we suspended the attorney for 30 days where for a period of two and a half years he was guilty of professional misconduct (commingling clients' funds with his own, converting to his own use funds held in trust

---

[7]Even if it be assumed that Louis executed the promissory note in favor of Mrs. Gayhardt on behalf of Hydro Life, a questionable assumption in view of Louis' testimony, petitioner admittedly did not deliver the note to Mrs. Gayhardt.

for the clients, misleading the clients that he held their funds in trust for payment of their doctor bills, although in fact he had commingled their money, making misrepresentations to the State Bar to conceal the true situation, and demonstrating a lack of candor in testifying before the local committee) and it appeared he had no prior disciplinary record, his conduct ultimately caused no loss to other parties, and the clients were difficult to deal with.

In *Himmel* v. *State Bar, supra,* 4 Cal.3d 786, we placed the attorney on probation for one year with three months' actual suspension where he signed or caused to be signed his client's name on a check knowing he lacked authority to do so, misappropriated her funds, and made certain misrepresentations and it appeared he had no prior disciplinary record and the client ultimately suffered no financial loss.

As noted in *Yapp* v. *State Bar,* 62 Cal.2d 809, 819 [44 Cal.Rptr. 593, 402 P.2d 361], "there is no conformity as to punishment ascertainable from the cases. Each case must be decided on its own facts."

■ On the facts of this case we have concluded that three months' suspension, as recommended by the board, is not adequate discipline, especially in view of petitioner's prior similar misconduct for which he was publicly reproved, and that the appropriate discipline is that hereinafter specified.

It is ordered that Charles L. Fielding be suspended from the practice of law for three years; that execution of the order be stayed and that he be placed on probation for the three years upon the following conditions:

(1) That during the first six months of the period of probation he shall be suspended from the practice of law in California;

(2) That during the period of probation, he shall comply with the provisions of the State Bar Act and Rules of Professional Conduct of the State Bar of California;

(3) That during the period of probation, he shall report not later than January 1, April 1, July 1, and October 1 of each year or part thereof during which the probation is in effect in writing to the San Francisco office of the State Bar of California certifying by affidavit or under penalty of perjury (provided, however, that if the effective date of probation is less than 30 days preceding any of said dates, he shall file the report on the due date next following the due date after the effective date):

(a) in his first report, (i) that he has read the State Bar Act and Rules of Professional Conduct of the State Bar of California since the effective

date of the probation, (ii) that he has complied with all provisions of the State Bar Act and said Rules of Professional Conduct since the effective date of the probation and (iii) if he is in possession of clients' funds, that he has deposited such funds in a bank or trust company, authorized to do business in the State of California, in a bank account separate from his own account and clearly designated as "Clients' Funds Account" or "Trust Funds Account," or words of similar import (identifying the bank account), that the funds continuously were maintained in said account until properly withdrawn on behalf of the clients, and that he has fully and correctly accounted for all such funds;

(b) in each subsequent report (i) if he still is in possession of clients' funds or, where entitled to practice law, has come into possession thereof during the period covered by the report, that he has deposited such funds in a bank or trust company and in an account therein of the kind hereinabove described (identifying the bank account), that the funds continuously were maintained in the account until properly withdrawn on behalf of the clients and that he has fully and correctly accounted for all such funds; and (ii) that he has complied with all provisions of the State Bar Act and Rules of Professional Conduct of the State Bar of California during the period;

(c) provided, however, that a final report shall be filed covering the remaining portion of the period of probation following the last report required by the foregoing provisions of this paragraph (3) certifying to the matters set forth in paragraph (3), subdivision (b), hereof.

The order shall be effective 100 days after this opinion is filed.