[L.A. Nos. 30387, 30287. In Bank. June 11, 1975.]

BERNARD L. NIZINSKI, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

Bernard L. Nizinski, in pro. per., for Petitioner.

Herbert M. Rosenthal and Ronald W. Stovitz for Respondent.

**OPINION**

**THE COURT.**—Petitioner seeks review of the recommendation of the State Bar Disciplinary Board to suspend him from the practice of law for two years and to require compliance with the provisions of rule 955, California Rules of Court.

Petitioner was admitted to practice law in January 1963. In 1972 he was suspended from practice for 30 days on findings that his untimely demand for arbitration resulted in his clients' loss of valuable rights and that he made false statements to his clients and to the State Bar concerning the case.

In L.A. 30387 the disciplinary board and local committee found that petitioner was retained in 1970 by Mr. Coleman on a criminal appeal and was paid $1,000, but that petitioner willfully failed either to perform services or to return the $1,000.

During the disciplinary proceedings, Coleman was in prison at San Luis Obispo where his deposition was taken and he was cross-examined by petitioner. Coleman said that while in county jail he spoke by telephone to petitioner who agreed to represent him upon payment of a $1,000 retainer. Subsequently, Coleman saw petitioner at the jail when petitioner said he "was looking into the matter and would see me."

Coleman also produced a copy of his letter to petitioner inquiring into the status of his case, and letters from his parents mentioning petitioner's address and telephone calls made to petitioner.[1]

Petitioner does not dispute that he received the $1,000, that he never returned it, that he never performed any services, and that he is not entitled to retain the sum. Rather, petitioner testified he did not know Coleman, never agreed to represent him, and deposited the $1,000 money order upon its receipt expecting to hear from the sender.

Petitioner objects to the use of Coleman's deposition, pointing out that the witness was available in the state, that no effort was made to bring him before the local committee, and that the committee could not observe his demeanor. ■ Business and Professions Code section 6052 limits the subpoena power to 150 miles, and Coleman was more than 150 miles from the location of the hearing.

The Civil Discovery Act (Code Civ. Proc., § 2016 et seq.), as limited or adapted by the Rules of Procedure of the State Bar, constitutes the method of discovery in disciplinary proceedings (rule 14), and permits respondent to obtain depositions (rule 14.13). (*Emslie* v. *State Bar* (1974) 11 Cal.3d 210, 220-221 [113 Cal.Rptr. 175, 520 P.2d 991].)

Code of Civil Procedure section 2016, subdivision (d) provides for admissibility at trial of a deposition of a witness when he is unavailable as a witness within the meaning of Evidence Code section 240. Subdivision (a)(4) of the latter section provides that a witness is unavailable when absent from the hearing and the proponent is unable to compel his attendance by its process. (See Witkin, Cal. Evidence (2d ed. 1966) §§ 452-453.)

Because Coleman was not subject to the subpoena power, his deposition was admissible. Petitioner had notice of the deposition and cross-examined the witness. Although, as petitioner points out, this court evaluating conflicting testimony has emphasized the local committee's ability to observe the witness (e.g., *Fielding* v. *State Bar* (1973) 9 Cal.3d 446, 451 [107 Cal.Rptr. 561, 509 P.2d 193]), this does not mean that depositions should not be admissible. In analogous situations, the great deference accorded factual determinations of trial judges does not preclude admission of depositions of unavailable witnesses. (Code Civ. Proc., § 2016, subd. (d); Evid. Code, § 240, subd. (a).)

---

[1]Apparently it was Coleman's sister who complained to the State Bar. She died before the hearings.

Coleman's deposition is corroborated by Western Union and bank records. Petitioner has not met his burden of showing that the board's action is erroneous. (*Schullman* v. *State Bar* (1973) 10 Cal.3d 526, 529 [111 Cal.Rptr. 161, 516 P.2d 865].) ▓ The record shows professional misconduct—petitioner promising to perform legal services upon payment of a fee, receiving the fee, and failing to perform the services.

In L.A. 30287, the disciplinary board and the local committee found that petitioner failed to perform services in three matters after accepting employment, knowingly misrepresented the status of the matters to his clients, and failed to place client's funds to their intended use in two of the matters.

### THE PERALTA-QUIROZ MATTER

In September 1967, Mrs. Peralta and Jorge Quiroz went to petitioner's office to retain him to contest the will of their aunt, Mrs. Perez. After a discussion of the facts, petitioner stated they had a "pretty good case" and agreed to take it for $500 plus "ten percent if we win . . . ." At this initial visit they paid a down payment, signing an installment note for the balance. Both witnesses testified the note represented their fee arrangement with petitioner for the will contest. The blanks in the note had been filled in by petitioner and in one space he had inserted the wording "[a]bove is fee owing in criminal case for J. Quiroz." Mrs. Peralta testified she did not read the note when she signed it, and Jorge Quiroz testified the note he signed did not contain the wording regarding the criminal matter.

A handwriting expert testified all writing on the note except for the signatures was by petitioner. He further testified the clause "(a)bove is fee owing on criminal case for J. Quiroz" was written by petitioner but on a surface different from the one used in writing the other insertions made by him.

Mrs. Peralta and Jorge Quiroz paid off the note over the following two years. During this period petitioner, by his own admission, gave legal advice regarding the will contest and settlement but never contested the will nor took any action on their behalf. Mrs. Peralta testified her inquiries to petitioner regarding the case were consistently met with his assurances not to worry because he was representing her and taking care of everything although he was reluctant to discuss the matter in any detail because he kept "forgetting the file at home." Jorge Quiroz testified to similar experiences.

Petitioner testified the $500 was paid for his services in defending Juan Quiroz in a criminal matter in 1965. Though Juan is the son of Jorge and the nephew of Mrs. Peralta, he was being reared by Mr. and Mrs. Perez, Jorge's aunt and uncle. Jorge was not contributing to Juan's support and it was Mr. and Mrs. Perez who employed petitioner to defend Juan. Petitioner billed them for the services but did not file a creditor's claim against either estate when they died though he was well aware there were assets in the estate of Mrs. Perez. Petitioner admitted he had never requested payment for the criminal matter from Mrs. Peralta or Jorge Quiroz prior to the time they visited him regarding the will.

Petitioner also testified he does not handle probate matters and so advised Mrs. Peralta and Jorge Quiroz when they first visited his office, urging them to consult other counsel. His partner testified petitioner never discussed this or any other probate matter with him.

Petitioner attacks the credibility of Mrs. Peralta, contending she first testified she did not sign the note and later changed her testimony stating she did sign the note. The record reveals her negative response referred to the signing of a note obligating her to the debt in the Juan Quiroz criminal matter.

### THE ARIAS MATTER

In 1968 petitioner represented Miguel Arias in a criminal matter. The jury returned a verdict of guilty, and at Arias' request petitioner filed a notice of appeal. Apparently because of Arias' failure to complete payment for his services at the trial level, petitioner failed to pursue the appeal, and in February of 1970 it was dismissed for want of prosecution.

Miguel Arias' mother, Mrs. Lowe, testified she met with petitioner in his office pursuant to Miguel's request and begged petitioner to institute a habeas corpus proceeding on his behalf. According to Mrs. Lowe petitioner refused the $300 check she had brought and stated he would need a thousand dollars to obtain a reporter's transcript and institute the habeas corpus proceeding. She testified she left the office but subsequently received a call from petitioner stating he would buy the transcript and bring the action for $500.

Mrs. Lowe's daughter-in-law (Miguel Arias' wife) gave a $500 check to a friend of petitioner who transmitted it to him. Petitioner cashed the check, using the proceeds for his own purposes. He did not order the transcript or take any further action on behalf of Miguel Arias.

In 1970 members of the Inmate Legal Assistance Group, a clinical program of the U.C.L.A. Law School under the supervision of Professor Arthur Rosett, were reached by Miguel Arias. Hubert Childress then a law student, but an attorney at the time of his testimony, indicated Arias told him in an interview petitioner was preparing an application for writ of habeas corpus, pursuant to a fee already provided by his mother.

Childress further testified he telephoned petitioner to inquire about the transcript of the Arias trial. Petitioner informed him a trial transcript had been ordered but had not yet arrived. Petitioner also stated he was doing the best he could on the habeas corpus matter. Three or four days thereafter Childress wrote a letter to petitioner confirming this conversation and requesting an opportunity to review the trial transcript when it arrived.[2] Petitioner did not respond in writing to this letter.

Subsequent telephone inquiries by Childress were fruitless and pursuant to his request, another law student, also an attorney at the time of his testimony, traveled to the federal district court in San Diego and learned no trial transcript had ever been ordered. On receiving this information Childress requested Professor Rosett to call petitioner. This call was made and the professor testified petitioner stated that Arias' mother had given him $500 for a trial transcript and that he had ordered the transcript.

Petitioner testified the $500 was not related to the trial transcript or the habeas corpus proceeding but instead was money owing him by Miguel Arias. According to petitioner, an old friend had loaned Arias $500 because of petitioner's promise to repay the money if Arias defaulted. Allegedly, Arias did default, and petitioner paid the friend the $500.

Petitioner also offered a declaration by Mrs. Lowe filed in a motion to reinstate the appeal before the United States Court of Appeals. In this declaration she stated a few days after visiting petitioner's office, her daughter-in-law informed her petitioner would take the case for $500. However, the record also reveals Mrs. Lowe testified she received the initial offer in the phone call and later had the phone conversation confirmed when her daughter-in-law returned from meeting with petitioner on another matter and stated petitioner wanted the $500 so he could proceed.

---

[2] At the hearing, petitioner acknowledged receipt of this letter and the original was admitted into evidence.

At the time of the hearing, Miguel Arias had been deported to Mexico. The State Bar attempted to secure his presence but he declined. He also refused to have his deposition taken in Mexico.

## THE ZALAMEA MATTER

Alfonso Zalamea retained petitioner to pursue a workmen's compensation claim on his behalf. On April 12, 1971, the referee awarded permanent disability benefits and medical expenses, and copies of the award were mailed on that date.

Zalamea's testimony may be summarized as follows: He was dissatisfied with the amount, and although the exact date was not clear, he telephoned petitioner expressing his displeasure after receiving the referee's award but before receiving the check in payment of approximately $2,250. He testified petitioner said he would file a petition to reconsider. Other attempts to consult petitioner by telephone and telegram were unsuccessful, and on May 6, 1971, he wrote a letter to petitioner assertedly to confirm the earlier conversation. He thereafter made approximately 10 attempts to reach petitioner after May 6, including sending several telegrams, but was unsuccessful. Approximately six months later, he went to petitioner's office, and petitioner said a petition for reconsideration had been filed. Learning that the Workmen's Compensation Appeals Board had no record of a petition for reconsideration and his condition having deteriorated, he subsequently had other counsel substituted to pursue a petition to reopen.

Cross-examination revealed that Zalamea, who was having some difficulty with the language, was unclear as to the date he talked to petitioner following receipt of the award although he remained adamant that the discussion occurred prior to his receipt of the check. The date of the check was not shown. He added that in the conversation he told petitioner to send the check back. Nevertheless, he cashed the check.

On cross-examination, Zalamea also stated all of the telegrams he sent were sent after he had received the decision of the referee. Two telegrams sent by him in September of 1970 prior to the decision were received in evidence.[3]

The May 6 letter stated: "This is to inform you that I'm not satisfied with the Workmen's Compensation case, for this reason I need you to

---

[3]One of the telegrams requested petitioner settle for $500.

open this case again or review the same. I call you many times, please call me at 339-6765 any time."

Petitioner testified that the letter of May 6, 1971, was the first communication between himself and Zalamea after the decision was rendered and that since a petition for reconsideration must be filed within 20 days after the decision,[4] the appeal was not filed because of Mr. Zalamea's delay and the lapse of the statutory period. He denied telling Zalamea that an appeal had been filed, although he admitted discussing a petition to reopen, claiming he told Zalamea that any such petition would depend on changes in medical condition and should await several months.

The disciplinary board and the local committee found petitioner had in the three matters violated the oath taken by him as an attorney within the meaning of section 6103 of the Business and Professions Code as prescribed by section 6067 of the Business and Professions Code by failing to perform services on behalf of his clients after accepting employment to do so; by committing acts involving moral turpitude within the meaning of that term as used in section 6106 of the Business and Professions Code in the three matters by knowingly misrepresenting to his clients the status of their cases; and in two of these matters by accepting the clients' funds without putting the funds to their intended use.

■ Though we are not bound by the findings below, one seeking review of the disciplinary board's recommendation has the burden of showing the findings are not supported by the evidence or are otherwise improper. (*Walter* v. *State Bar* (1970) 2 Cal.3d 880, 887 [87 Cal.Rptr. 833, 471 P.2d 481].) ■ The charges of unprofessional conduct should be supported by convincing proof to a reasonable certainty and any reasonable doubts should be resolved in favor of the accused. (*Himmel* v. *State Bar* (1971) 4 Cal.3d 786, 794 [94 Cal.Rptr. 825, 484 P.2d 993]; *Zitny* v. *State Bar* (1966) 64 Cal.2d 787, 789-790 [51 Cal.Rptr. 825, 415 P.2d 521].) ■ However, the findings must be given great weight and " '[w]hen the findings . . . rest primarily on testimonial evidence, we are reluctant to reverse the decision of the local administrative committee, which was in a better position to evaluate conflicting statements after observing the demeanor of the witnesses and the character of their testimony.' " (*Himmel* v. *State Bar, supra,* 4 Cal.3d 786, 794.) When the evidence at the local committee's hearing consisted primarily of conflict-

---

[4]Labor Code section 5903.

ing testimony, the opportunity to observe the witnesses constrains us to weigh heavily the testimony supporting the committee's findings. (*Sampson* v. *State Bar* (1974) 12 Cal.3d 70, 74 [115 Cal.Rptr. 43, 524 P.2d 139]; *Ridley* v. *State Bar* (1972) 6 Cal.3d 551, 559 [99 Cal.Rptr. 873, 493 P.2d 105].)

Petitioner has not met his burden of showing the findings are not correct as to the Peralta-Quiroz or the Arias matters. The testimony of Mrs. Peralta and Jorge Quiroz clearly supports the findings in that matter, and the circumstances make it unlikely that they visited petitioner with the intention of securing his services but left under an obligation to pay for services neither requested nor received by them.

■ Petitioner argues the testimony of the handwriting expert only shows the language regarding the criminal matter was written on another surface. He suggests the inference it was done at another time is no more logical than the inference it was done at the same time but on a different surface. He thus invokes the rule providing where equally reasonable inferences may be drawn from a proven fact, the inference leading to a conclusion of innocence rather than the one leading to a conclusion of guilt will be accepted. (*Himmel* v. *State Bar, supra,* 4 Cal.3d 786, 793-794.)

In applying this rule, the probability of the inferences should be viewed in light of the entire record before they are found to be equally reasonable, and when this is done, we must conclude the inferences are not equally reasonable.

The testimony of Mrs. Lowe corroborated by her daughter, Childress, and Professor Rosett clearly supports the findings in the Arias matter. ■ Petitioner complains that he was deprived of due process of law because Miguel Arias, the asserted "complaining" witness, did not testify and was not available for cross-examination. However, it does not appear that Miguel was the "complaining" witness, rather it was his mother and wife. In any event, there was no deprivation of due process of law. (*Walter* v. *State Bar, supra,* 2 Cal.3d 880, 890-891.)

A closer question, however, is presented as to the Zalamea matter. His testimony that petitioner agreed to petition for reconsideration in a telephone conversation prior to May 6 is impeached by the language of the letter of that date, indicating that it was the first statement of his dissatisfaction with the referee's award. Similarly, his testimony that he told petitioner to return the check in the telephone conversation reflects

an understanding that he could not accept the award and seek reconsideration at the same time; nevertheless he accepted the check and cashed it. No grounds for reconsideration were mentioned by Zalamea. ■ Coupled with his uncertainties as to the exact time of the telephone conversation, we conclude there is no proof to a reasonable certainty that petitioner promised to petition for reconsideration, or that he subsequently said he had filed the petition.

It is ordered that effective 30 days after filing this opinion, petitioner is suspended from the practice of law for two years and until making restitution of $1,000 to Mr. Coleman; that petitioner shall also comply with rule 955 of the California Rules of Court within 60 days following filing of this opinion.