[L. A. No. 26996. In Bank. May 21, 1963.]

ALEXANDER H. SCHULLMAN, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

Alexander H. Schullman, in pro. per., and Herbert E. Selwyn for Petitioner.

Garrett H. Elmore and Herbert M. Rosenthal for Respondent.

THE COURT.—Petitioner, Alexander H. Schullman, aged 59, was admitted to practice law in this state in 1937. He was found guilty on three counts of professional misconduct, all of which relate to his acts in connection with money bor-

rowed from his clients (Mr. and Mrs. David Kaufman) and their efforts to obtain security for and repayment of the funds loaned. Although petitioner has failed to sustain his burden of showing lack of support for the recommendation of the Board of Governors of the State Bar that he be suspended from practice for a period of one year, we have concluded, for reasons which will appear, that he should be placed on probation for the period and subject to the conditions hereinafter specified, rather than suspended from practice.[1]

Mr. and Mrs. Kaufman had been clients of petitioner for many years. On April 17, 1959, petitioner borrowed from them the sum of $10,000 and as evidence of the indebtedness gave them his promissory note in that amount, bearing interest at the rate of 10 per cent per annum, and payable one year thereafter. At that time he also agreed to give them certain collateral security for the debt, but that security shortly thereafter seemingly proved valueless. The following month (May 1959) petitioner borrowed the further sum of $1,200 from Mr. Kaufman, also evidenced by petitioner's unsecured promissory note, payable on demand. In July 1960, following complaint by the Kaufmans to the State Bar, petitioner wrote the local administrative committee that the Kaufmans "have been, and perhaps still are, clients . . . of mine. . . ."

Meanwhile, the Kaufmans were attempting to obtain from petitioner security for repayment of the two loans, and on November 16, 1959, petitioner signed and delivered to Mr. Kaufman a document stating that "I hereby assign, grant and turn over to you all that certain 100 acres . . . in Kern County [described] . . . as security for" the two loans. On the date of this purported conveyance of land petitioner had no record title or interest in such land; his only claim of interest therein was under a contingent fee agreement with one Berlin, who was petitioner's client. Pursuant to the fee agreement petitioner was to receive title to the 100 acres if Berlin prevailed in certain litigation involving a larger land holding. Kaufman testified that when, in January 1960 he asked petitioner for "the title, deeds or whatever I needed to claim the land and put it up for sale," petitioner sent him a copy of the contingent fee agreement with Berlin. Petitioner in his testi-

---

[1] The local administrative committee recommended a three-year suspension upon probationary terms which included twelve months' actual suspension and restitution to the Kaufmans of certain monies collected by petitioner.

mony claimed that the contingent agreement gave him a "vested interest" in the land, and stated further that concurrently with delivery to Kaufman of the purported conveyance of November 16 he had shown Kaufman a copy of the fee agreement and explained the situation to him; that ultimately Berlin did receive the land, but subject to a $6,000 encumbrance which Berlin was unable to pay. Petitioner asked Kaufman to pay it, but Kaufman refused, and whatever potentiality of security existed in the property was lost. Petitioner never saw the land, but Berlin told him the 100 acres "should be worth $10,000." We are not convinced that the evidence fails to support the board's finding (Count Six) that petitioner "made said illegal conveyance to the Kaufmans, and concealed the true state of the title in order to induce said Kaufmans to accept false security. . . ."

Mr. Kaufman continued his efforts to obtain repayment of the $10,000 loan, or some substantial security therefor, and testified that petitioner "told me that he would satisfy me if I met him on or about" February 10, 1960, in a certain restaurant. Kaufman did so, according to his testimony, and at the meeting petitioner "told me that he could get some money to me by making it appear as though I had paid him a $10,-000 retainer instead of giving him a loan, and that I could use this as a tax deduction . . . [H]e assured me that this was legal and that I would save about $6,000 or so on my taxes and that he would still repay the note. I told Mr. Schullman to go ahead, if it was legal and proper, and that was the end of the conversation." Two or three days later Kaufman received in the mail a statement on petitioner's printed billhead, dated April 15, 1959, for legal services in the sum of $10,000. The statement bore the typed notation: "April 17, 1959 Received Payment ALEXANDER H. SCHULLMAN." Neither petitioner's nor any other signature appeared thereon.

Petitioner's version of this occurrence was that Kaufman had told petitioner that he (Kaufman) was having difficulties with a business associate to whom he had stated that he had paid $10,000 for counsel fees, and asked petitioner to give him a bill showing such a payment. Petitioner refused. The following day petitioner was in court and his secretary "called me five times and said that Mr. Kaufman had called and asked for a statement. I told her not to send such a statement. She finally called me and said he was coming down to get it. I said to get rid of him; 'He is harassing you. Tell him I will not sign it.' She knew and everybody knows I

sign receipted bills. . . . I said 'Send anything that will pacify, but don't sign my name to anything. I will see him tomorrow.' . . . I called him the next day and told him . . . '. . . it is ridiculous. If I am asked I will tell the complete truth . . . I am sorry; you can't use it. It doesn't have any significance.' . . . I said 'It is not worth anything because you badgered me into it and I would have to sign it personally.' . . . He said, 'Forget about it. I have forgotten about the whole thing. I have torn up the letter.' "

Petitioner testified that he did not see the statement before it was mailed and that his secretary later indicated to him that she had obtained from Kaufman the information upon which she made it up. The secretary, with her husband, had moved out of the state and she did not testify. There was no evidence that the statement was used in connection with income tax returns of either Kaufman or petitioner. It appears that at the time of the Kaufman loans petitioner was having tax difficulties with the federal government. He argues that "It is inconceivable, that Petitioner, a practicing attorney for many years, could possibly, when in the midst of tax liens and attachments with the Federal Government," agree with Kaufman to provide Kaufman with evidence of payment to petitioner of a $10,000 fee which petitioner did not receive but upon which he might thereafter be obliged to pay income tax.

 The board found (Count Four) that the statement was mailed to the Kaufmans pursuant to a "scheme and plan" of petitioner that petitioner "would give the Kaufmans a receipted statement purporting to be for services rendered to them in 1959, and that the Kaufmans could then use said statement as a deduction for their income taxes for the year 1959 and the respondent [petitioner] would still pay the full $10,000.00 principal on the outstanding promissory note. . . . That the respondent knew that said false statement, if used as a deduction from income taxes by the Kaufmans, would be a deliberate and calculated fraud on the United States government." We have concluded, as to this incident of the charges, that the evidence does not support the finding of a consummated "fraudulent scheme and plan" but that even temporizing with it in the manner shown establishes culpability.

 Kaufman continued pressing petitioner for payment of the loans, and in March 1960 petitioner wrote Kaufman a letter indicating an intent to apply certain anticipated legal

fees to that purpose. In June 1960 $300 was paid by petitioner to Kaufman. Thereafter, by a document dated August 1, 1960, petitioner assigned to Attorney Marshall Ross, with whom petitioner then contemplated an office association, an account for legal fees due (or soon to become due) from a labor union to petitioner in the approximate amount of $12,000. By a letter dated August 4, 1960, Ross notified Kaufman of the assignment and stated further that petitioner "has instructed me that upon receipt of said moneys from said obligors, in the amount of $12,000.00, . . . or whatever amount, that I shall immediately transmit the same to you directly, either in payment or part payment of the obligation of Mr. Schullman to you.

"I have been further informed that in the event that the amount involved is less than the total payment, then I shall have assigned to me other moneys due and owing to Mr. Schullman, but to be paid to me directly, so that I can expedite in his behalf repayment of his obligation to you. . . . [W]ithout any personal liability on my part whatsoever, I shall immediately upon receipt of any and all such funds under the assignment of Mr. Schullman, transfer said funds, upon my receipt thereof, to you. . . ." Under date of August 9, 1960, petitioner also wrote a letter to Kaufman, enclosing a copy of the assignment he had made to Ross, and stating among other things, "It is my understanding that this will be kept by you, and will be returned to me upon payment on or about October 1, 1960, as contemplated. It is also understood that there will be no contact with my clients [the labor union] except through Mr. Ross or me." Insofar as concerns petitioner's obligation to furnish security to the Kaufmans the making of the assignment transferred the legal title in the account to Ross, with the beneficial interest in the Kaufmans.

Nothing further had been paid to Kaufman by October 1, 1960, and on October 12 petitioner rendered his statement for fees to the labor union in the sum of $6,000 and advised the union that the next billing would be in four or five months. On October 21, 1960, petitioner received $500 as part payment on his statement of October 12; none of this $500 was delivered to either Kaufman or to Ross for Kaufman. Patently, this was a misapplication of funds. Kaufman testified that sometime between October 1 and November 10, 1960, petitioner told him he would have to wait another month for payment.

On November 8, 1960, Attorney Paul Selvin, as counsel for Kaufman, discussed with Ross the assignment of the fees from petitioner. Selvin testified that Ross advised him that he, Ross, had not informed the union of the assignment and did not himself know whether petitioner was owed any fees by the union, and that he had no objection to Selvin's notifying the union that the assignment had been made. On November 9 Selvin wrote the union advising them of the assignment, and sent petitioner a copy of the letter. On November 16, 1960, petitioner received $5,500 from the union, which was the unpaid balance under the statement of October 12. On the same day, instead of sending the $5,500 to Ross, or directly to the Kaufmans, petitioner sent Kaufman a check for $3,000, together with a letter stating among other things that "What you have done [notifying the union of the assignment of fees] has resulted in a decimation of the amount that I have received, although it was in excess of $3,000.00, and funds were required and payments made which had legal priority." Petitioner put the retained balance of the $5,500 to other uses; this constituted a misappropriation of his clients' funds.

Thereafter, during December 1960 and through 1961 Attorney Selvin discussed with petitioner payment of the obligation to Kaufman, and received promises but no payments.

On May 24, 1961, petitioner wrote the labor union acknowledging that the balance of fees owing to him would be not over $8,000, and enclosing his statement for $5,000 thereof. Petitioner received $5,000 from the union in May 1961, none of which was paid over to Kaufman or to Ross for Kaufman. In October 1961 petitioner rendered his final bill to the union for fees, in the sum of $3,000; the record does not show whether this sum was paid, but there is no evidence that Kaufman received any of it. Thus, although from the date of the assignment to Ross for Kaufman of the labor union fees, petitioner received the sum of $11,000 on account of such fees (and had billed the union for an additional $3,000), he retained $8,000 of this amount and paid to Kaufman only $3,000. Ross testified that he received no money under the assignment.

The board found (Count Two) that in receiving and retaining the $8,000 from the union, petitioner, "with full knowledge of his legal obligations under the assignment" of the fees to Kaufman, "did wilfully and wrongfully convert and appropriate" such money to his own use and benefit, and, further, that contrary to petitioner's claims the assignment

to Kaufman "was not breached or invalidated by" Kaufman's acts in notifying the union of the assignment "nor did said notice result in a decimation of the amount of fees due" petitioner from the union. This finding and the conclusion thereon are fully sustained.

In addition to matters already set forth hereinabove petitioner testified and contends as follows with respect to his loans from Kaufman and his subsequent conduct in relation thereto: For at least six or seven years prior to the time of the loans he had befriended Mr. and Mrs. Kaufman and had rendered them various legal services in connection with certain of their business enterprises, either free of charge or for nominal fees. During the first week of April 1959 Mr. Kaufman called at petitioner's office, coming "to me as usual on a friendship basis" and requested that petitioner write a letter to a firm which owed Kaufman some $75,000, which petitioner did. While Kaufman was present petitioner received "a call from my former wife. I was behind in alimony and . . . he heard my responses," and inquired what the trouble was. Petitioner then "explained to him that at that time I was in arrears in my rent, I was in arrears with my alimony, there was a tax problem. After my airplane crash, and I was ill for seven years, friends of mine lent me money, and I had about twenty to thirty thousand dollars . . . at that time in debts, but I didn't want to go into bankruptcy because I had then and had always had a fairly decent practice." Kaufman thereupon mentioned that petitioner had helped him and his wife in the past and inquired whether a loan would help. Petitioner said it would, that he didn't know just when he could repay it but probably within a year, and he mentioned certain anticipated fees. Kaufman asked time to think the matter over and discuss it with his wife. During one of various social encounters with the Kaufmans during the next several days Kaufman told petitioner that he and Mrs. Kaufman "were so grateful that we think we could give you a loan of ten thousand to help you." Two days later, on April 17, 1959, Kaufman brought a check for $10,000 to petitioner's office and petitioner said he would give Kaufman a "promissory note for 10 per cent because I don't want you to lose on it." The following month petitioner requested and received from Kaufman the additional loan of $1,200.

Concerning the assignment of anticipated fees from the union, petitioner testified that Kaufman originally requested

an assignment direct to himself, but petitioner stated that he did not wish the union to know of the assignment as it would embarrass him and damage his relations with that client, and Kaufman "agreed with me." The assignment to Ross, as described hereinabove, was thereupon made, with petitioner emphasizing to Kaufman that Kaufman was not to notify the union and stating "If you do the whole thing is out." Petitioner stated that following notification of the union by Kaufman's counsel in November 1960, union representatives informed him of their annoyance that "a creditor contacted them" and thereafter reduced the amount of work which petitioner performed for the union, and "I don't get anything else from them." Petitioner claimed further that if the union had not been notified of the assignment, his fees for work already performed would have been greater and that he would have repaid Kaufman the full original loan of $10,000. Petitioner also seemingly claims that union representatives told him they had been notified of the assignment by telephone either before or shortly after October 1, 1960, and threatened to dispense with his services. Petitioner asserts that the conduct of Kaufman in informing the union of the assignment breached the condition on which the assignment had been made to Ross for Kaufman's benefit, and thereby excused petitioner from honoring it and from paying over to Kaufman the full fees received thereafter from the union; that petitioner had other obligations and he decided to pay them. In the circumstances the very assertion of the stated proposition raises a doubt as to petitioner's ethical qualifications even though it well may be a product of his financial desperation.

Testimony by the secretary of the union indicated that the union had received telephone calls concerning the assignment before the copy thereof had been mailed to them by Kaufman's counsel on November 9, 1960, and that the witness had told petitioner that "I didn't like such activities as this . . . and I wished he would keep these sort of things out of our deals," although none of the fees paid to petitioner were reduced by reason of the assignment, as "It had no bearing on our relations at all."

Ross, to whom the assignment was made for Kaufman's benefit, testified that when Kaufman's counsel, Selvin, inquired whether Ross had notified the union of the assignment, Ross "told him I did not, and in fact my understanding it was the very thing to avoid doing. . . . [I]n our conversation both with Mr. Kaufman and with Mr. Schullman I was ad-

vised that the reason why this transaction was consummated this way was to prevent ... Mr. Schullman's client ... knowing that an assignment had been made. He didn't want to be embarrassed.'' It appears to us that pride of common honesty and fair dealing should be more important than concern for embarrassment of the type claimed.

Ross stated further that when during the summer of 1960 he was discussing a possible office association with petitioner, ''I knew that he [petitioner] had financial problems. . . . I told Mr. Schullman that I wouldn't go into a partnership unless we [*sic*] cleared up his financial obligations, and that I felt that he had one of two courses to take; one to . . . go into bankruptcy; or to attempt some kind of an arrangement or compromise with his creditors. And I thought that bankruptcy would be a less intolerable situation than the one he was in, that is the one in relation to his creditors. I didn't see how he could continue to practice with that burden weighing on him, and I urged him to go into bankruptcy. . . . He told me he thought that he could pay up his creditors . . . within a reasonable time . . . [that] he wanted to pay his creditors.''

At the time of hearings in this matter in November 1961 petitioner declared that he was still attempting to pay his creditors, including ''the Government. The Government to this day has priority on three accounts. They get approximately ten to twelve thousand dollars a year. . . . I nearly lost them, but the clients are keeping me so I am working for the Government on that.''

Petitioner, relying on his version of events as related above, argues that no moral turpitude on his part has been shown, and no ground for discipline. ▇ The rule is that in reviewing a disciplinary proceeding this court passes upon the sufficiency and weight of the evidence and is not bound by the findings of fact of the local committee or the board, although the burden of showing that the board's findings are not supported by the evidence or that its decision or action is erroneous or unlawful is upon the petitioner. (*Rock* v. *State Bar* (1962) 57 Cal.2d 639, 642 [1, 2] [21 Cal.Rptr. 572, 371 P.2d 308]; *Best* v. *State Bar* (1962) 57 Cal.2d 633, 635 [1, 2] [21 Cal.Rptr. 589, 371 P.2d 325]; *Black* v. *State Bar* (1962) 57 Cal.2d 219, 222 [3] [18 Cal.Rptr. 518, 368 P.2d 118].) ▇ However, '' 'charges of unprofessional conduct on the part of an attorney should be sustained by convincing proof and to a reasonable certainty and . . . any reasonable doubts

should be resolved in favor of the accused. [Citations.]' "
(*Black* v. *State Bar* (1962), *supra,* at p. 222 [2] ; see *Magee* v.
*State Bar* (1962) 58 Cal.2d 423, 430 [4] [24 Cal.Rptr. 839,
374 P.2d 807].)

 As noted at the outset, petitioner concedes that Mr.
and Mrs. Kaufman were his clients at the times the two loans
were made. To them he owed the highest good faith. (*Magee*
v. *State Bar* (1962), *supra,* at p. 429 [3].) Even if we
should accept petitioner's versions of his dealings with Kauf-
man following the loans, with respect to the purported convey-
ance of land (Count Six) and the fictitious fee statement
(Count Four), the fact remains that after making an assign-
ment to Ross for Kaufman's benefit of the legal fees due (or to
become due) on account from the labor union (Count Two)
petitioner nevertheless accepted payment of such fees per-
sonally and retained the major share thereof for purposes other
than payment of the Kaufman loans. Even though Kaufman
may have breached the condition upon which petitioner asserts
he consented to the assignment, by notifying the union there-
of, such notification does not warrant petitioner's conduct in
failing to pay the funds over to Kaufman when received from
the union. Rather, in our view, retention of the assigned
funds constituted their misappropriation ; this was an act of
moral turpitude, and merits suspension from practice for
a substantial period of time, if not actual disbarment.

Throughout our consideration of the various incidents re-
vealed in this proceeding we have endeavored to understand
petitioner and the motivations for his conduct. We think
that misfortune and mismanagement contributed to his posi-
tion; and that his errors, however grievous, were not deliber-
ately planned evils. This does not justify or excuse an attorney
at law but it can tend to give him a further opportunity to re-
establish himself in the profession. In this connection it ap-
pears without question that from some date prior to accepting
the loans from Kaufman and continuing at least to the time
of the hearings in this proceeding (November of 1961) peti-
tioner was laboring under heavy financial burdens brought
about by sickness, domestic and alimony problems, and tax
difficulties with the federal government, and that it was his
choice to attempt to pay off his obligations in full rather than
resort to bankruptcy with consequent probable loss to his cred-
itors. He testified that such attempts continued at the time
of the hearings herein. He has no previous record of disci-

pline. Two other attorneys testified as character witnesses in his behalf.

Under such circumstances, and although the one-year suspension recommended by the board appears to be amply warranted, it is our view that no particularly useful purpose would be served in further disrupting petitioner's practice at this point, and at least diminishing his earnings to the disadvantage of his creditors whom he is attempting to pay. Rather, we have determined that while suspension for a substantial period is merited, execution thereof should be suspended and petitioner placed on probation.

It is therefore ordered that petitioner be suspended from the practice of law for a period of three years; that execution of the order for suspension be stayed, and that petitioner be placed on probation for such period of three years upon the following conditions:

1. That during the period of probation, he shall comply with the provisions of the State Bar Act and the Rules of Professional Conduct of the State Bar of California;

2. That during the period of probation, he shall report in writing not less often than once every two months to the San Francisco office of the State Bar of California certifying:

(a) In his first report, that he has just read the State Bar Act, the Rules of Professional Conduct of the State Bar of California and the Canons of Professional Ethics of the American Bar Association;

(b) In each subsequent report, (i) the extent to which he has made restitution to Mr. and Mrs. David Kaufman on account of the $8,000 which he received from the labor union and misappropriated to his own use following the assignment to Ross for the Kaufmans; (ii) that he has complied with all provisions of the State Bar Act and the Rules of Professional Conduct of the State Bar of California during such reporting period;

3. That the period of probation shall commence forthwith.

It is further ordered that at the expiration of such probation period, if petitioner has complied with the terms of probation, this order suspending him from the practice of law for a period of three years shall terminate;

PROVIDED, HOWEVER, That if petitioner shall sooner establish by proof satisfactory to the Board of Governors of the State Bar of California that he has made full restitution to the Kaufmans of such misappropriated funds, and if petitioner has in all other respects complied with the terms of

probation, and has satisfied the Board of Governors that he is rehabilitated, then and in that event, upon the filing herein of a certificate of the Board of Governors recommending such action, this order suspending petitioner from the practice of law may be forthwith terminated.

Petitioner's application for a rehearing was denied June 19, 1963.