[L.A. No. 30428. In Bank. Oct. 7, 1975.]

RICHARD V. JACKSON, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

COUNSEL

Wallace B. Farrell for Petitioner.

Herbert M. Rosenthal and Ronald W. Stovitz for Respondent.

OPINION

THE COURT.—This is a proceeding to review a recommendation of the Disciplinary Board of the State Bar (Board) that petitioner Richard V. Jackson be suspended from the practice of law in this state for two years on conditions of probation, including actual suspension for the first six months and making restitution to his client.

Petitioner was admitted to practice in 1961 and has no prior disciplinary record. Petitioner was charged in a notice to show cause with the violation of his oath and duties as an attorney (Bus. & Prof. Code, §§ 6103, 6067, 6068), the commission of acts involving moral turpitude and dishonesty (Bus. & Prof. Code, § 6106) and the violation of rule 9 of the Rules of Professional Conduct of the State Bar.[1] After a hearing, the local committee found petitioner guilty of all violations charged in the notice to show cause and also determined that he had violated rule 5 of the Rules of Professional Conduct of the State Bar.[2] The committee further concluded that petitioner's character was lacking with respect to the traits of honesty and integrity, in that he was unable to comprehend the impropriety of his conduct, and recommended that he be suspended from the practice of law for a period of two and one-half years and that he be required to make reimbursement to his client Daniel Byerly in the sum of $1,739.75 plus interest.[3] The Board made findings similar to those of the local committee but recommended that petitioner be suspended from the practice of law for two years, that execution of the order for such suspension be stayed and that petitioner be placed on probation for said two-year period on conditions including actual suspension for six

[1] Rule 9 provides in relevant part: "A member of the State Bar shall not commingle the money or other property of a client with his own; and he shall promptly report to the client the receipt by him of all money and other property belonging to such client. Unless the client otherwise directs in writing, he shall promptly deposit his client's funds in a bank or trust company, authorized to do business in the State of California, in a bank account separate from his own account and clearly designated as 'Clients' Funds Account' or 'Trust Funds Account', or words of similar import. . . ."

This proceeding is governed by the Rules of Professional Conduct in effect prior to January 1, 1975, rather than the new Rules of Professional Conduct adopted by the Board of Governors of the State Bar and approved by this court on December 31, 1974, to become effective January 1, 1975. (*Tomlinson* v. *State Bar* (1975) 13 Cal.3d 567, 569, fn. 1 [119 Cal.Rptr. 335, 531 P.2d 1119].) Hereafter all references to the Rules of Professional Conduct are to the rules in effect prior to January 1, 1975.

[2] Rule 5 provides: "A member of the State Bar shall not accept employment adverse to a client or former client, without the consent of the client or former client, relating to a matter in reference to which he has obtained confidential information by reason of or in the course of his employment by such client or former client."

[3] The above conclusions and recommendations were adopted by two members of the committee. A third member concluded that petitioner was guilty of violating his oath and duties as an attorney and rule 9 of the Rules of Professional Conduct of the State Bar. However, he did not find that petitioner had committed acts involving moral turpitude and dishonesty, and he dissented from the committee's conclusion that petitioner's character was lacking with respect to the traits of honesty and integrity. Furthermore, he was of the view that it was improper for the committee to make a finding of guilt or innocence with respect to a violation of rule 5, since such offense was never charged. Finally, he recommended a more lenient discipline, consisting of a public reprimand and required reimbursement of $1,793.75 plus interest to Daniel Byerly.

months and restitution to his client, Daniel Byerly, in the sum of $1,793.75.[4]

The facts as found by the local committee and adopted by the Board with certain modifications are in substance as follows:

In December 1967, Daniel Byerly, a general contractor, retained petitioner to represent him in an action against a subcontractor. After securing a favorable trial court judgment, petitioner, with Byerly's consent, negotiated a settlement of the case for $5,250 which Byerly was to receive in two equal installments. On July 29, 1968, the first installment of $2,625 was paid in trust to petitioner who deducted $1,068.75 for attorney's fees and remitted the balance of $1,556.25 to his client. Between July 29, 1968, and January 31, 1969, after some dispute, petitioner and Byerly reached an agreement whereby the latter was to receive the first $500 of the settlement recovery free of attorney's fees and petitioner was to be paid 40 percent of the remaining $4,750, resulting in a total fee of $1,900.[5] Thus, petitioner should have retained only $831.25 from the second installment.

On December 31, 1968, petitioner received the second installment check of $2,625. He induced Byerly to endorse this check by assuring him that he would receive $1,793.75 of the final payment.

Before giving Byerly his share of the settlement funds, petitioner became aware that Frederick S. Wing, an attorney with whom he shared office space, had a claim against Byerly in the amount of $673 for legal services rendered about eight years earlier. This claim was disputed by

[4]The Board also recommended that if petitioner failed to make said restitution within the first six months of the two-year period of suspension and to furnish satisfactory evidence thereof to the State Bar, that actual suspension be extended until said restitution is made, but in no event for a period of time exceeding two years. Other recommended conditions of probation included: Compliance with the State Bar Act and Rules of Professional Conduct; filing of quarterly reports with the State Bar, accompanied by a certificate from a public accountant certifying that petitioner has kept records distinguishing between his own and his clients' funds; answering fully, promptly and truthfully any inquiries by authorized representatives of the Board relating to petitioner's compliance with the terms of probation.

The Board's recommendation as to discipline was adopted by a vote of 10 to 4. Each of the four Board members voting "no" did so on the ground that the recommended discipline was excessive. Two of the dissenting members were of the view that the length of actual suspension recommended was excessive; the other two believed that the degree of discipline recommended was excessive.

[5]Although this fact is not noted in the findings, it is undisputed that Byerly had already paid petitioner $500 as a retainer.

Byerly. Without the latter's knowledge or consent, petitioner deducted an additional $673 plus interest in the sum of $391.07 from the second installment check in satisfaction of Wing's claim. Pursuant to an agreement between Wing and himself, petitioner kept one-half of the $1,064.07 so deducted as a fee for collecting Wing's claim. The above deduction was not authorized by any oral or written agreement between petitioner and Byerly and constituted a misappropriation of the client's trust funds to petitioner's own use and to the use of Wing.

Petitioner thereafter tendered $719.18 of the second installment to Byerly by a check dated January 31, 1969, and drawn against his trust account in the Banning branch of the Security Pacific National Bank. The check specified that it was a final settlement. Byerly did not cash the check. On June 24, 1969, petitioner closed the Security Pacific trust account and informed Byerly by letter that if the latter surrendered the January 31, 1969, check, petitioner would issue another check in an identical amount against a new trust account. Byerly did not surrender the check and petitioner failed to hold the $719.18 fund in a separate account. Rather, he commingled the funds with his own, spent them for his personal use and benefit, and thereby misappropriated his client's money.[6]

Petitioner contends that the evidence is insufficient to sustain the findings of the Board and that the discipline recommended by the Board is excessive.

We take up the first contention in the light of the familiar principles governing the scope of our review which require no restatement here. (See e.g., *Yokozeki* v. *State Bar* (1974) 11 Cal.3d 436, 443-444 [113 Cal.Rptr. 602, 521 P.2d 858], and cases therein cited; *Himmel* v. *State Bar* (1971) 4 Cal.3d 786, 793-794 [94 Cal.Rptr. 825, 484 P.2d 993], and

---

[6]Two members of the local committee also found that petitioner had testified falsely in the hearing with respect to his assertions that there had been a written agreement between himself and Byerly authorizing deduction of Wing's claim from the trust fund and that Byerly had removed this written agreement from the file. These committee members also found that petitioner was incapable of understanding the impropriety of his conduct. All three members of the committee were of the view that petitioner's misappropriation of $1,064.07 from Byerly's trust fund was done in good faith, based upon petitioner's belief that this amount was due and owing to Wing and that his deduction of the amount was entirely proper, and that because of this belief in the propriety of his conduct, petitioner failed to demonstrate any remorse or contrition during the disciplinary proceedings.

The Board deleted these findings and substituted therefor the finding that there was no written or oral agreement between petitioner and Byerly authorizing the deduction of Wing's claim from the trust funds.

cases therein cited.) The record shows that in 1967 Daniel Byerly, a general contractor, consulted petitioner regarding the former's pending lawsuit against a subcontractor. Petitioner testified that at the time of this first visit, while Byerly was in the reception room, his "associate,"[7] Frederick Wing, took petitioner aside and told him that Byerly was a difficult client who did not fulfill his obligations with respect to fee payments. Wing's information regarding Byerly was based upon his own representation of the client in 1959 and 1960. Apparently, Byerly had refused to pay Wing's bill of $673 for attorney's fees and court costs. Wing had written Byerly in 1961, stating that he would be willing to accept $498 to cover his out-of-pocket expenses as payment in full. Byerly failed to pay any amount; Wing, however, never sued to recover the fee.

Petitioner testified that during his initial meeting with Byerly, he informed the client that he would not agree to represent him unless the Wing debt was paid.[8] Furthermore, he stated that he quoted Byerly a rather high fee for his own services, consisting of a $500 retainer in advance plus 50 percent of any recovery. Byerly testified that he did not recall the initial fee arrangement proposed by petitioner. However, petitioner was not retained at that time.

Byerly returned to petitioner's office in late 1967 and retained petitioner in the pending litigation. However, Byerly testified that it was petitioner who initiated the renewed discussions by telephoning him and stating that he would undertake the case for a $500 retainer and a contingency fee of 30 percent of any recovery. Byerly claimed that the terms of this agreement were never embodied in writing, and that no mention was made of the Wing debt.

According to petitioner's testimony, Byerly returned to his office on his own initiative, asked petitioner to represent him, and agreed to the fee arrangement he proposed—namely, a $500 retainer, 45 percent of any recovery, and collection of the fee owed by Byerly to petitioner's

---

[7]Frederick Wing had established a law practice in the city of Banning, California, some years earlier. In 1967 he entered into an agreement with petitioner whereby the latter was to share his office space, buy the physical assets of the firm and gradually take over the practice. Neither party considered the arrangement to be a partnership or an employment relationship. Rather, they apparently operated independently, with Wing gradually terminating his own active practice.

[8]Petitioner testified that he did not anticipate receiving any portion of the Wing debt for his own benefit at that time. Rather, he imposed the condition in order to placate Wing, who was rather upset at seeing Byerly in their offices.

associate Wing. Petitioner stated that at this time he had not expected to receive any portion of Wing's fee but had insisted upon its payment lest Wing become angry because petitioner represented Byerly. He testified that the terms of his fee arrangement with Byerly, including the payment of Wing's fee, had been incorporated into a written agreement, but that Byerly later removed this agreement from petitioner's office file without his knowledge or consent.[9] The only evidence corroborating in part petitioner's version of the events was Wing's testimony that he vaguely recalled Byerly stopping by his office and "in a rather contemptuous manner saying he wouldn't pay me the amount that I charged, but would give me some other sum, the amount I don't remember."

The record establishes without contradiction the successful completion and eventual settlement of Byerly's suit. It also shows that at about this time petitioner and his associate Wing agreed that Wing would pay to petitioner as a collection fee 50 percent of any amount collected by the latter from Byerly on account of the unpaid fee owing to Wing by Byerly. The record similarly establishes the receipt by petitioner, as Byerly's attorney, of the two installment payments in accordance with the settlement, the dispute between petitioner and Byerly over petitioner's fee in the case, and the consequent refusal of Byerly to endorse the second installment check.

Finally, on January 20, 1969, petitioner wrote to Byerly in an effort to induce him to sign the check. The letter, received in evidence, purported to describe petitioner's position regarding their original fee agreement —namely, a $500 retainer and a 45 percent contingency, and Byerly's position, calling for a lesser fee, and went on to propose a compromise: "We offer to take 40% of $4,750.00 as payment in full on this case. In that manner you receive the first $500.00 of the settlement clear of attorney fees. Under these reduced terms we receive $831.25 from the check on hand in the amount of $2,625.00. Said check will soon be void because of age if not deposited this week."[10] However, the letter made absolutely no reference to the Wing fee, either in discussing the original terms contemplated by petitioner and Byerly, or in describing the proffered compromise. It is not disputed that petitioner and Byerly eventually agreed to the terms of this proposed compromise and that no mention was ever made of the Wing fee in connection with it.

---

[9] Petitioner testified that his agreement with Byerly would also have been reflected in his office ledger card, but that he did not know where such card was at the time of the hearing.

[10] As previously noted, Byerly had already paid petitioner a $500 retainer fee.

Byerly went to petitioner's office and endorsed the second settlement check, expecting to receive in return a check in the amount of $1,793.75.[11] However, in determining the sum due Byerly, petitioner deducted not only $831.25 for his own attorney fees as agreed, but also the sum of $1,064.07 representing Wing's unpaid fee for legal services rendered Byerly some nine years before, together with interest.[12] Petitioner then, pursuant to his agreement with Wing, retained 50 percent of this $1,064.07 as a collection fee. These deductions left a total of $719.18 for Byerly out of the $2,625 settlement payment.

On January 31, 1969, petitioner tendered Byerly a check in the amount of $719.18 drawn on petitioner's trustee account in the Banning branch of the Security Pacific National Bank, noting on the check that it was in final settlement. The documents accompanying the check advised Byerly that the $1,064.07 deduction was for attorney's fees and interest due Wing.

Byerly testified that he had never authorized petitioner to pay all or any portion of Wing's claim and had been unaware that petitioner was representing Wing in regard to this matter. Petitioner admitted that Byerly gave him neither oral nor written authorization to withhold any part of the proceeds of the settlement on behalf of Wing and that he had been aware that any action to recover Wing's fee would have been barred by the statute of limitations. However, he sought to justify his conduct on the ground that he "was wearing two hats. . . . I was representing Mr. Wing to enforce it [the debt] because any action I have comes through Mr. Wing." He denied that the arrangement created any conflict, asserting that Byerly had promised to pay the Wing debt during their initial discussions in 1967. He stated that he had done some research on the question and had consulted two other attorneys, and that on this basis he had concluded that he was permitted by law to withhold the sum claimed by Wing. He did not recall researching the ethical considerations of his conduct and admitted that he had never discussed the matter with Byerly after their initial meetings in 1967, despite their

[11]Byerly testified that petitioner's secretary had informed him by telephone that if he came to petitioner's office on January 21, 1969, and endorsed the final installment check, another check in the amount of $1,793.25 would be waiting for him. He stated, however, that when he arrived, the secretary told him that the settlement check would have to be signed and cashed before petitioner could pay him the $1,793.75. The secretary did not recall either conversation.

[12]Petitioner also deducted $10.50 for the preparation of a certificate of doing business under a fictitious name. Byerly testified that it was his understanding that petitioner would perform this service as a courtesy.

subsequent dispute over petitioner's own fee and the eventual compromise agreement. He offered no explanation as to why he elected to deduct the Wing fee from the second, rather than the first, settlement payment.

The record establishes without dispute that after receiving the check in the amount of $719.18, Byerly wrote to petitioner protesting the deduction of the Wing debt without his knowledge or consent and expressing his dissatisfaction with the payment as a final settlement. The letter informed petitioner that Byerly would not cash the check and planned to turn the case over to the proper authorities for investigation. On June 24, 1969, petitioner wrote to Byerly and informed him that he had closed the Security Pacific trustee account, but would be willing to issue another check for $719.18 against his new trustee account at the Palm Springs National Bank upon Byerly's surrender of the original check.

Byerly never surrendered the check and petitioner thereafter commingled the trust funds with his personal funds and spent the money for his own use and benefit. He sought to justify this conduct on the ground that he considered the matter in the nature of "a disputed fee" and so described it in his petition for bankruptcy filed September 16, 1971. He did not explain, however, his basis for classifying the $719.18 admittedly owed to Byerly as "disputed." When asked whether he still believed that he had acted properly in withdrawing the sum allegedly due Wing from Byerly's trust account without written authorization, petitioner answered in the affirmative.[13]

We are satisfied by our review of the record that petitioner has failed to sustain his burden of showing that the findings of the local committee, as modified by the Board, are not supported by the evidence. ▮ It is undisputed that petitioner failed to comply with the terms of the fee arrangement which he himself had proposed to Byerly by letter dated January 20, 1969, before the latter signed the second installment check. It is also undisputed that petitioner withheld and appropriated to himself and his associate funds in the amount of $1,064.07, clearly due his client under such fee arrangement, without the latter's knowledge or consent. Finally, it is beyond any question, and indeed admitted, that petitioner appropriated and expended for his personal benefit the sum of $719.18 held in trust for and manifestly belonging to his client. These facts

[13]Petitioner also presented the testimony of two witnesses who stated that his reputation for truth and veracity was good.

clearly support the finding that petitioner misappropriated monies due Byerly.

Nor has petitioner convinced us that contrary to the findings of the committee and the Board, his conduct was justified because, according to petitioner's explanation, Byerly had originally promised in writing to pay Wing's fee as part of the consideration for petitioner's accepting Byerly's case. The evidence regarding the parties' initial negotiations was primarily testimonial in nature. Petitioner and Byerly related conflicting stories as to what actually transpired at their first meetings. The latter denied ever promising to pay the Wing fee, either orally or in writing. The documentary evidence that was presented in regard to this question, consisting of petitioner's own letters to Byerly describing their conflicting claims as to the terms of their original agreement and proposing a compromise, made no mention of the Wing matter. This evidence fully supports the findings of the committee and the Board, accepting Byerly's testimony that he never agreed to pay the amount claimed by Wing as part of the consideration for petitioner's legal services.

We note that the local committee, which observed the demeanor of the witnesses and the character of their testimony, was in a better position to evaluate their conflicting statements. (*Toll* v. *State Bar* (1974) 12 Cal.3d 824, 831 [117 Cal.Rptr. 427, 528 P.2d 35].) ██ In attacking the committee's determination with regard to this matter, petitioner merely reiterates his own version of the events as related in his testimony. In so doing, he has failed to sustain his burden of showing that these findings are not supported by the evidence.

We turn now to petitioner's contention that the discipline recommended by the Board is excessive. Petitioner argues that it is "unduly harsh and punitive" since he had entertained a good faith belief that he was acting properly in handling his client's trust funds. We consider the question in the light of the applicable principles to which we have referred in numerous decisions and which require no restatement. (See e.g., *Spindell* v. *State Bar* (1975) 13 Cal.3d 253, 261 [118 Cal.Rptr. 480, 530 P.2d 168], and cases therein cited; *In re Kreamer* (1975) 14 Cal.3d 524, 531-532 [121 Cal.Rptr. 600, 535 P.2d 728], and cases therein cited.)

The evidence adduced at the hearing reveals serious professional misconduct on petitioner's part which reflects a flagrant disregard of professional ethics and responsibilities. About the time he received Byerly's trust funds, he agreed to take advantage of his position for his

own financial benefit and for the financial benefit of one with an interest adverse to his client's. In carrying out this commitment, he misappropriated $1,064.07 of Byerly's settlement proceeds, admittedly without the latter's knowledge or consent and in violation of the express terms of their fee agreement which petitioner himself had proposed. Furthermore, even in handling the remaining funds which he knew belonged to Byerly, petitioner breached his professional duties to his client by commingling the trust funds with his own personal funds, and wilfully appropriating them to his own use and benefit. These facts support the conclusions of the committee and the Board that petitioner violated his oath and duties as an attorney (Bus. & Prof. Code, §§ 6103, 6067, 6068), is guilty of the commission of acts involving moral turpitude and dishonesty (Bus. & Prof. Code, § 6106), and violated rules 5 and 9 of the Rules of Professional Conduct of the State Bar. (See *Brody* v. *State Bar* (1974) 11 Cal.3d 347, 350 [113 Cal.Rptr. 371, 521 P.2d 107]; *Mrakich* v. *State Bar* (1973) 8 Cal.3d 896, 905 [106 Cal.Rptr. 497, 506 P.2d 633].)

Petitioner cannot escape discipline for his action on the ground that he did not comprehend his ethical duties under these circumstances and did not realize the impropriety of what he did. (*Noland* v. *State Bar* (1965) 63 Cal.2d 298, 303 [46 Cal.Rptr. 305, 405 P.2d 129].) ▮ His conduct "manifests an abiding disregard of ' "the fundamental rule of ethics— that of common honesty—without which the profession is worse than valueless in the place it holds in the administration of justice." ' " (*Tomlinson* v. *State Bar, supra,* 13 Cal.3d 567, 577.) Discipline is clearly warranted by the facts of this case.

The only remaining question is whether the discipline recommended by the Board is, as petitioner maintains, "unduly harsh and punitive." On the one hand, petitioner has not been involved in any prior disciplinary proceedings (*In re Cohen* (1974) 11 Cal.3d 416, 422 [113 Cal.Rptr. 485, 521 P.2d 477]) and was apparently unaware of his fiduciary duties under the circumstances. (Compare *Crooks* v. *State Bar* (1970) 3 Cal.3d 346, 358 [90 Cal.Rptr. 600, 475 P.2d 872].) On the other hand, however, petitioner's conduct involved a misappropriation of his client's trust funds, " ' "a gross violation of general morality as well as professional ethics . . ., likely to endanger the confidence of the public in the legal profession." ' " (*Walter* v. *State Bar* (1970) 2 Cal.3d 880, 891 [87 Cal.Rptr. 833, 471 P.2d 481].) Furthermore, petitioner's testimony before the committee and his contentions in this court indicate that he still does not understand the impropriety of his conduct. (*Noland* v. *State Bar, supra,* 63 Cal.2d 298, 303.) Weighing and balancing these considerations,

we conclude that the discipline recommended by the Board is appropriate[14] except that under all the circumstances it should not include as a condition of probation that petitioner make restitution to Daniel Byerly in the sum of $1,793.75 or any other sum.

It is ordered that petitioner be suspended from the practice of law for a period of two years, but that execution of the order be stayed and that he be placed on probation for said two-year period upon the conditions prescribed by the Disciplinary Board in this matter, including the condition that he be actually suspended for the first six months but excluding the condition that he make restitution of $1,793.75 to Daniel Byerly. This order is effective 30 days after the filing of this opinion.

---

[14]We have frequently stated that the misappropriation of funds entrusted to an attorney merits severe discipline, even in cases where the attorney has no prior disciplinary record. (*Brody* v. *State Bar, supra,* 11 Cal.3d 347, 350.) The discipline imposed in prior cases involving similar offenses indicates that the punishment recommended in the matter at bench is not excessive. (See *Brody, supra,* 11 Cal.3d at pp. 350-351 and cases cited therein.)