[L.A. No. 30459. In Bank. Jan. 26, 1976.]

RUSSELL G. GREENBAUM, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

894

**COUNSEL**

Russell G. Greenbaum, in pro. per., and Dennis Paul Dorman for Petitioner.

Herbert M. Rosenthal and Stuart A. Forsyth for Respondent.

## OPINION

**THE COURT.**—This is a proceeding to review a recommendation of the Disciplinary Board of the State Bar of California (board) that petitioner be suspended from the practice of law for three years, on conditions of probation and no actual suspension. The basis for the recommended discipline is that petitioner violated rule 9, Rules of Professional Conduct, in that he, without prior authorization, withdrew clients' funds totalling $11,000 from trust accounts and appropriated them to his personal use.[1]

The local administrative committee recommended a four-year suspension, on conditions of probation, with one year's actual suspension, the suspension not to terminate until petitioner filed prescribed reports with the State Bar certifying that he has read the State Bar Act and Rules of Professional Conduct and that he understands the requirements for the handling of clients' trust funds. The board, by a vote of 13 to 1, adopted the findings of the local committee, with a minor modification, and made an additional finding that the complaining witness acknowledged that all funds converted by petitioner had been repaid prior to his complaint to the State Bar. By a vote of 11 to 3, the board recommended three years' suspension on conditions of probation[2] with no actual suspension. Two of the dissenting members thought the discipline recommended was

---

[1]At the time of petitioner's misconduct, rule 9, in relevant part, read: "A member of the State Bar shall not commingle the money or other property of a client with his own; and he shall promptly report to the client the receipt by him of all money and other property belonging to such client. Unless the client otherwise directs in writing, he shall promptly deposit his client's funds in a bank or trust company, authorized to do business in the State of California, in a bank account separate from his own account and clearly designated as 'Clients' Funds Account' or 'Trust Funds Account,' or words of similar import. . . ."

In addition to violation of rule 9, the notice to show cause had charged petitioner with violating his oath and duties as an attorney and the commission of acts involving moral turpitude, dishonesty and corruption (Bus. & Prof. Code, §§ 6103, 6067, 6068). No conclusions were made on the latter.

[2]The recommended conditions of probation are: (1) compliance with the provisions of the State Bar Act and the Rules of Professional Conduct of The State Bar of California, (2) submission of quarterly written reports to the State Bar certifying such compliance, particularly with regard to the handling of clients' funds and the accounting for such funds, (3) submission of quarterly certificates from a public accountant or a certified public accountant attesting to petitioner's having properly kept and maintained (i) a trust account for clients' funds at a California bank or trust company and (ii) adequate books and records of all accounts and transactions involving clients' funds, and (4) agreement to fully, promptly and truthfully answer any inquiries relating to his compliance with the terms of probation from any authorized member(s) or representative(s) of the disciplinary board, except to the extent prohibited by the attorney-client privilege and the privilege against self-incrimination.

insufficient. After petitioner waived his right of review and requested entry of an order imposing the discipline recommended by the board, we notified him that we were considering more substantial discipline. Petitioner then filed his petition for review, contending that the findings are not supported by the evidence and that the recommendation of the board is erroneous, unlawful and unwarranted. He urges that private censure is an appropriate measure of discipline.

Petitioner was admitted to practice on June 19, 1968, and has no prior disciplinary record.

In October 1970 petitioner was retained by George J. Leach, president of Leach Industries, and after December 1970 was paid a monthly retainer by that corporation. Petitioner also represented Mr. Leach in the formation of a new corporation, GR Products, Inc., and on previous occasions had represented him on personal matters.

From the sale of a house, Mr. Leach received $42,451.52, which he planned to use for the construction of a new home for himself and Mrs. Leach. He consulted petitioner with regard to safekeeping of the money, and petitioner recommended that it be deposited in an attorney's trust fund account, in amounts of less than $20,000 each. Mr. Leach delivered the money to petitioner, and both Mr. and Mrs. Leach testified that they informed him that it was to be used strictly for the construction of their new home. They authorized petitioner to make withdrawals at their request and to forward such monies to them. Mrs. Leach informed petitioner she would be paying the bills for the new house and most of the requests for withdrawals would come from her.

The $42,451.52 was deposited in petitioner's regular trust account on December 8, 1970, and on that same date he opened three separate client's trust accounts at Home Federal Savings and Loan Association of San Diégo (hereafter "Home trust accounts"), depositing $15,000 in each of two accounts and $10,000 in the third account. Petitioner retained the passbooks and was the only signatory on the accounts. The remainder of $2,451.52 was paid to Mrs. Leach.

At various times thereafter the Leaches authorized petitioner to withdraw a total of $30,000. Sometime after the middle of June 1971 when Mrs. Leach requested an additional $10,000 she was informed by petitioner that nothing remained in the Home trust accounts. At her request petitioner submitted an accounting on July 2, 1971, disclosing

withdrawals on three dates that the Leaches complained were without their authorization, knowledge or consent. Petitioner stipulated that he made the withdrawals; he denied that they were unauthorized.

Hearings before the local committee were held on three days between December 14, 1973, and March 8, 1974. Numerous documents, largely from petitioner's files and records, were received in evidence, including photocopies of his regular clients' trust account checkbook, as well as a letter he had written on April 4, 1973, to the chairman of the local committee following the preliminary investigation, wherein he sought to refute the complaint against him. As will hereinafter appear, in many instances his testimony was inconsistent and contradicted by the documentary evidence.

*January 28, 1971, Withdrawal of $2,000.*

Petitioner admits that he did not talk with Mr. Leach prior to making this withdrawal. He deposited the $2,000 in his regular trust account, with a notation "Deposit—G. Leach (GR Prod.) 2000." At this time his regular trust account was overdrawn $82, thus leaving only $1,918 of the Leaches' $2,000. On this same date petitioner issued a check to his wife for $550 on his regular trust account, with a notation that it was repayment of a loan, reducing the balance in his trust account to $1,368. Thereafter he disbursed a total of $603.75, which he noted as payments for "Leach," $400, with a notation that it was for GR Products, and $94.50 for disbursements unrelated to the Leaches. By February 5, 1971, the balance in his regular trust account was only $241.75.

Petitioner testified that the purpose of the withdrawal was to repay him for fees he had advanced for the incorporation of GR Products, Inc., and to pay a portion of his legal services. He had not billed GR Products for $2,000 but had sent a statement dated January 7, 1971, to Leach Industries in the amount of $1,000 for "Trust fund for establishing new corporation . . . including state fees." This statement, according to petitioner, was for services rendered prior to January 7, 1971.

Petitioner testified that he told Mr. Leach the next day (Jan. 29, 1971) that he had withdrawn $2,000 from the Home trust accounts;[3] that Mr. Leach "raised holy hell" and told him the Home trust accounts were his personal funds and that the expenses for GR Products would be paid

[3]Mr. Leach testified he did not know of the withdrawal until receipt of petitioner's accounting on July 2, 1971.

separately by himself and an associate in the new enterprise; and that Leach instructed him to replace the $2,000 in the Home trust account and not to make any further withdrawals without the Leaches' specific authorization. Petitioner did not replace the $2,000 because he did not receive the money from Leach. His justification for the withdrawal was that in prior dealings he had authority to use Leach's funds. He also claimed that in order to show that the GR Products account was current, he paid himself $1,000 out of his regular trust account and, in effect, lent GR Products this sum.

He admitted receiving $1,250 from GR Products in two checks, one dated February 8, 1971, for $1,100 and one dated March 9, 1971, for $150, but said those payments represented only part of the fee he had quoted for his services for the incorporation. These checks were deposited in his regular trust account.

█ Whether his services to GR Products were worth more than he received is irrelevant, for it is settled that an attorney may not unilaterally determine his own fees and withhold trust funds to satisfy such fees, even though he may be entitled to reimbursement for his services. (*Silver* v. *State Bar,* 13 Cal.3d 134, 142 [117 Cal.Rptr. 821, 528 P.2d 1157]; *Brody* v. *State Bar,* 11 Cal.3d 347, fn. 5 at p. 350 [113 Cal.Rptr. 371, 521 P.2d 107]; *Crooks* v. *State Bar,* 3 Cal.3d 346, 358 (7) [90 Cal.Rptr. 600, 475 P.2d 872]; *Most* v. *State Bar,* 67 Cal.2d 589, 597 [5] [63 Cal.Rptr. 265, 432 P.2d 953].) In any event, he withdrew twice the sum he claimed was due from the corporation and misappropriated to his own use, at the very least, the $550 he paid to his wife and other expenditures unrelated to Mr. Leach. This documentary evidence contradicts the statement in his letter of April 4, 1973, that after withdrawing the $2,000 from the Home trust accounts he repaid his loan to the new organization and "held the balance for G. R. Products' credit."

*March 18, 1971, Withdrawal of $2,000.*

Petitioner withdrew another $2,000 and deposited it in his regular trust account with a notation "Leach 2000." On the same day he issued a check to himself in that amount, his check stub and the check indicating that it was for "General Acct. Exp." The balance in his regular trust account was then only $612.

In the April 4, 1973, letter he stated that this withdrawal was made pursuant to Mr. Leach's specific request that petitioner have funds

available "at all times, day or night and on weekends . . . I can only speculate as to the reason for Mr. Leach's request." The letter did not state that the funds had been expended on Mr. Leach's behalf. At the December 14, 1973, hearing he testified that he held the money in cash, disbursed it to Mr. Leach over the ensuing months, giving him $100 or 200 at a time. He believed he kept a "small tab" and knew at all times how much the balance was, but was unable to locate the tab. At the continued hearing on March 8, 1974, he produced a document listing dates to refresh his memory of business trips with Mr. Leach. Two of the dates that he identified were 10 days or more prior to the withdrawal. The document contained no amounts of any expenditures, and all the dates of meetings, trips and conferences related solely to GR Products.

He also testified that when Mrs. Leach asked him about this withdrawal after she received his accounting of July 2, 1971, he told her he "had given it to her husband in cash on various trips we had made," but since he was unable to find any record of the expenditures he repaid her $2,000 plus $55 interest on August 13, 1971, from his regular trust account.

Petitioner's failure to produce any written records of the claimed expenditures is in itself a suspicious circumstance and supports an inference that he converted the proceeds to his own use. (*Walter* v. *State Bar,* 2 Cal.3d 880, 889 (6) [87 Cal.Rptr. 833, 471 P.2d 481].) The notation on his check that the $2,000 was for "general account expenses" does not jibe with his story that the money was intended and expended solely for Mr. Leach's benefit.

*April 7, 1971, Withdrawal of $7,000.*

A check for $2,000 drawn on the Home trust accounts was made payable to P. A. Greenbaum, petitioner's wife, and deposited in their joint banking account. Petitioner drew another check for $5,000 payable to "Russell G. Greenbaum-Clients Trust Account" and deposited it therein, with a notation in his check book that the deposit was a "loan from client (taxes, etc.)." He then issued a check to himself in the amount of $4,000 from his trust account, noting on the check that it was a "loan." He appropriated $6,000 of the Leaches' money to his own use, retaining $1,000 in his regular trust account.

Petitioner's version of this transaction as an authorized loan was in direct conflict with that of the Leaches, who testified that they were not

aware of the withdrawal until they received an accounting from petitioner on July 2, 1971, and thereafter had to accept the fact that petitioner borrowed the money.

The substance of petitioner's account is taken from his testimony and from the April 4, 1973, letter to the local committee. In late March 1971 he asked Mr. Leach if he could borrow some money from his savings accounts. He told Leach the purpose of the loan was to pay his taxes and other bills; that a portion would go to his wife "to clear up some of her household bills"; and that petitioner would lend some to his brother. He offered to pay 7½ percent interest, which was higher than Leach was receiving on his savings accounts and lower than petitioner and his brother would be paying at a bank. Prior to April 7, 1971, Leach agreed to lend him $7,000 from the Home trust accounts. Petitioner assumed he would have the use of the money for several months and when Leach wanted it, it would be repaid in 30 days. To the best of his recollection, a note for $7,000 was prepared but not delivered.

The letter and his testimony were inconsistent, in that while the letter stated he would repay the loan within 30 days of demand, he testified, when asked what period of time he thought he would have to repay the loan after demand, "Frankly, I hadn't thought of any specific period of time." Moreover, we observe that when petitioner later produced the $7,000 note it recited "Thirty (30) days from date of demand . . . I promise to pay" etc.

At the December 14, 1973, hearing petitioner said a note had been executed in the amount of $6,000 and the last time he saw the note it was in Leach's files that were turned over to an attorney later retained by him. Petitioner did not say when the note was executed. At the March 8, 1974, hearing he introduced in evidence a one-page handwritten document which he described as a copy of his "action list," on which he had written on April 21, 1971, "Leach notes" and a notation "R.H.G. Note" (petitioner's brother Richard) on the same date. He testified that "Leach notes" meant the promissory note for $6,000 that he gave to, or prepared for, Mr. Leach to represent the money he had borrowed on April 7.[4]

---

[4]Petitioner's explanation of the difference in the amounts of $6,000 and $7,000 was that after he made the $7,000 withdrawal it was determined that among himself, his wife and his brother only $6,000 was needed and the $1,000 remained in his regular trust account until April 19, 1971, when it was disbursed to Mrs. Leach.

After the conclusion of the hearings before the local committee, petitioner was permitted to introduce additional evidence before the board, and produced a typewritten note for $7,000, dated April 7, 1971, payable to George Leach, 30 days after demand, signed by petitioner, which he said was "located only a short time ago . . . and not available for presentation at trial." Since the board adopted the finding of the local committee that the April 7, 1971, withdrawal was unauthorized, it apparently attached little importance to petitioner's belated production of the undelivered $7,000 note. Petitioner's subjective intent to repay Mr. Leach did not resolve the conflict in their testimony whether Leach agreed to lend petitioner the money before its withdrawal.

At the request of Mr. Leach the Home trust accounts were closed on August 10, 1971, and he demanded that petitioner repay the loan by August 31, 1971. By September 9, 1971, petitioner had repaid the principal but no interest on the loan. He testified that he later credited $242 interest to the Leach account, but produced no evidence to show either the date or amount thereof. By this time petitioner had accounted to the Leaches for all but $2,000 of their money. He repaid $1,500 of this balance by utilizing his $600 monthly retainer fees from Leach Industries for the months of December 1971, January 1972 and half of the February retainer. In a letter to Mr. Leach dated February 1, 1972, he acknowledged that he still owed $500 plus interest. Sometime thereafter, another dispute arose between Mr. Leach and petitioner regarding legal fees claimed by petitioner.[5] The record does not indicate how or when the $500 balance was paid, but Leach testified that he "got the last $2,000" by crediting petitioner with retainer fees, and the inference drawn from his testimony is that he apparently deducted the $500 petitioner owed him from legal fees claimed by petitioner.

█ Having in mind the familiar rule that charges of unprofessional conduct should be sustained by convincing proof and to a reasonable certainty and any reasonable doubts will be resolved in favor of the accused, we conclude that petitioner has failed to sustain his burden that the findings are not supported by the evidence. █ In attacking the

---

[5] Sometime in August 1972 Leach consulted another attorney, who suggested that the fee dispute be settled by arbitration before a local bar association. Arbitration resulted in a determination in January 1973 that Leach owed $72.65. In the meantime Leach had complained against petitioner to the State Bar in October 1972, and about the time of the arbitration award, which was unsatisfactory to petitioner, he filed an action against Leach Industries in small claims court for $500 in attorney fees. Eventually, on March 15, 1973, an agreement was reached in which petitioner and Leach settled their claims against one another, including dismissal of the small claims action.

findings, petitioner merely reiterates his own version of the transactions. The question whether the withdrawals were unauthorized was contested. ■ However, when findings rest primarily on testimonial evidence, the decision of the local committee, which was in a better position to evaluate conflicting statements after observing the demeanor of the witnesses and the character of their testimony, must be given great weight. (*Jackson* v. *State Bar*, 15 Cal.3d 372, 381 [124 Cal.Rptr. 185, 540 P.2d 25]; *Nizinski* v. *State Bar*, 14 Cal.3d 587, 595-596 (5) [121 Cal.Rptr. 824, 536 P.2d 72]; *Toll* v. *State Bar*, 12 Cal.3d 824, 831 [117 Cal.Rptr. 427, 528 P.2d 35].) ■ Petitioner's assertion that he at no time intended to misappropriate the Leaches' money was controverted by the documentary evidence that he deposited their trust funds in his own account and used them for his personal obligations.

During all the above transactions, Mr. Leach was petitioner's client, to whom he owed the utmost duty of good faith and fidelity. (*Cutler* v. *State Bar*, 71 Cal.2d 241, 251 [78 Cal.Rptr. 172, 455 P.2d 108]; *Clancy* v. *State Bar*, 71 Cal.2d 140, 146 [2] [77 Cal.Rptr. 657, 454 P.2d 329]; *Schullman* v. *State Bar*, 59 Cal.2d 590, 600 [5] [30 Cal.Rptr. 834, 381 P.2d 658].) The Leaches entrusted funds to him and depended solely on him to administer such funds in an interest-bearing trust fund. He deprived them of interest the funds would have earned had they remained in the Home trust accounts. He abused the trust and confidence placed in him to gain a monetary advantage for himself. His misconduct is not excused in any way merely because his client ultimately suffered no loss. (*Bradpiece* v. *State Bar*, 10 Cal.3d 742, 748 [111 Cal.Rptr. 905, 518.P.2d 337].)

The conclusion that petitioner violated rule 9 is abundantly supported by the documentary evidence and by his admission that he kept personal funds in his regular trust account. This court stated in *Vaughn* v. *State Bar*, 6 Cal.3d 847, 853 [100 Cal.Rptr. 713, 494 P.2d 1257], ". . . commingling, prohibited by rule 9 of the Rules of Professional Conduct, is established where a client's money is intermingled with that of his attorney in such a way that it may be used by the attorney for his personal expenses . . . ."

Petitioner was examined at length regarding entries in his regular clients' trust checkbook, not only with reference to the Leach transaction but others as well. Without going into detail as to petitioner's restitution to the Leaches, which was made in various amounts and over a period of time, it is sufficient to note that repayment was by checks drawn on his

regular trust account, except for $1,500 that later came from his retainer fees from Leach Industries. Some of the deposits to his regular trust account at the time he repaid the purported loan were personal funds received from his mother's estate.

In examining photocopies of his check stub record, the local committee observed that many checks were written without reference to which client the expenditures pertained. In addition, checks were written for stamps, and to petitioner with a notation that the check was for secretarial services. Numerous checks were to petitioner which he noted as "draw." Over a 10-month period from March through December 1971 these "draws" totalled $8,358. The record shows beyond question that he used what was denominated a clients' trust account for his personal convenience and as a general business account in utter disregard of the rule against commingling.

Petitioner contends that Leach's complaint was malicious and was made for the purpose of embarrassing, harassing and discrediting him. We recently said in *Sodikoff* v. *State Bar,* 14 Cal.3d 422, 431 (6) [121 Cal.Rptr. 467, 535 P.2d 331]: "Although we scrutinize with care any evidence bearing 'the earmarks of private spite' [citation], it is nevertheless settled that 'Whatever may have been the instigating factor, or whatever may have been the personal motive, in the initiation of the State Bar proceeding, are not matters of controlling concern in a case where the facts disclosed independently lead to the conclusion that the attorney is subject to some disciplinary action.' [Citations.]" In the present case, petitioner's misappropriation and commingling clearly warrant discipline.

■ Although the board's recommendation of the discipline to be imposed is given great weight, the final word rests with this court, and we impose more severe discipline when it is warranted. (*Silver* v. *State Bar,* 13 Cal.3d 134, 147 (10) [117 Cal.Rptr. 821, 528 P.2d 1157], and cases cited.) ■ As mentioned earlier, the board recommended no actual suspension. The State Bar brief now suggests that the recommendation of the local committee of four years' suspension on conditions of probation with one year actual is amply warranted, even lenient.

■ The extent of the discipline imposed does not derive from a fixed formula but rather is determined from a "balanced consideration of the relevant factors." (*Silver* v. *State Bar, supra,* 13 Cal.3d 134, 146 (9) quoting from *Bernstein* v. *State Bar,* 6 Cal.3d 909, 919 [101 Cal.Rptr. 369,

495 P.2d 1289].) ■ "Misappropriation of a client's property is a gross violation of general morality likely to undermine public confidence in the legal profession and therefore merits severe punishment." (*Yokozeki v. State Bar,* 11 Cal.3d 436, 450 (16) [113 Cal.Rptr. 602, 521 P.2d 858]; *Brody* v. *State Bar, supra,* 11 Cal.3d 347, 350 (4); *Bradpiece* v. *State Bar, supra,* 10 Cal.3d 742, 746-747.) Wilful violation of rule 9 alone warrants a maximum of three years' suspension. (Bus. & Prof. Code, § 6077; *Wells* v. *State Bar,* 15 Cal.3d 367, 371 [124 Cal.Rptr. 218, 540 P.2d 58].)

■ Petitioner has no prior disciplinary record and restitution has been made, factors in his favor. However, he appears unrepentant and continues to maintain that he was justified in using his client's personal trust funds to pay for legal services rendered to GR Products, Inc. under ostensible authority in accordance with prior custom, even though he admitted that he had been instructed to redeposit the funds. He still argues that another $2,000 was expended for business trips and cash outlays to Mr. Leach in spite of the fact that he was unable to substantiate any such expenditures. Moreover, contrary to his testimony that he requested Leach to lend him $7,000, he asserted in his brief before this court that the April 7, 1971, withdrawal "was a loan suggested by claimant."[6] Although he admitted that he kept personal funds in his regular trust account, and in the face of abundant documentary evidence that he used it to pay personal obligations, he contends that such commingling was "technical," and that the "draws" to himself of $8,358 was an "unfortunate labeling" because they in fact represented attorney fees that he was transferring to his personal or general accounts.

Considering the seriousness of petitioner's professional misconduct in placing his financial interests above those of his client, we conclude that a period of actual suspension is warranted. The additional period of probation will afford petitioner an opportunity to prove his statement that he has taken corrective measures in his bookkeeping procedures to prevent recurrence of the situation that existed here. It is therefore ordered that petitioner be suspended from the practice of law for four years, that execution of the order be stayed, and that he be placed on probation for said period of four years upon condition that he be actually suspended for the first three months. During the remaining period of

---

[6]Apparently petitioner realized that this was a misstatement; at oral argument he said he requested the loan.

probation he shall comply with the conditions recommended by the board (see, *ante,* fn. 2, page 896.) This order is effective 30 days after the filing of this opinion.